UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE OPELOUSAS DIVISION


MICHAEL JOHNSON              CIVIL ACTION NO. 6:16-cv-01002

       Plaintiff

VERSUS                       JUDGE REBECCA F. DOHERTY

SETPOINT INTEGRATED
SOLUTIONS, INC.,             MAGISTRATE JUDGE CARL B.
      Defendant       WHITEHURST

*********************************************************


DEPOSITION OF MICHAEL JOHNSON


    The deposition of MICHAEL JOHNSON was taken in
the above entitled cause, pursuant to the following
stipulation before Sylvia C. Molbert, Certified Court
Reporter, at the law offices of Becker & Hebert, LLC,
201 Rue Beauregard, Lafayette, Louisiana, on the 18th
day of May, 2017, beginning at 8:59 a.m.

**EXHIBIT**

**1**

MICHAEL JOHNSON                                                    5/18/2017

Page 8

```
 1    Q    Sixty years old.  Sixty years young, I should
 2         say.  And what's your physical address?
 3    A    1203 Tornado Drive, Church Point, and that's
 4         70525.
 5    Q    How long have you lived there?
 6    A    Approximately seven years.
 7    Q    Is it a house or an apartment?
 8    A    House.
 9    Q    Who lives with you?
10    A    My wife and 17-year-old son.
11    Q    Do you have any other children?
12    A    I do.
13    Q    How many other children do you have?
14    A    Three.
15    Q    Are they all adults?
16    A    They're all adults, yes.
17    Q    Do you have some grandchildren?
18    A    I do.
19    Q    How many grandchildren do you have?
20    A    Three.
21    Q    Nice.  Are you currently working?
22    A    I am currently trying to put together a new
23         company.
24    Q    What kind of company are you putting together?
25    A    Wellhead components.  And there will be some
```

```
 1                other products added as we go forth.

 2      Q    I am not familiar with wellhead components.  What

 3           is that?

 4      A    You might have heard the term "Christmas tree"?

 5      Q    Yes.

 6      A    Okay.  That's a wellhead.  And so, components, it

 7           could be gate valves that go with that, tree

 8           caps, the other valve products that are all in

 9           there.  That's why they call it a Christmas tree.

10           It's like all different kind of things put

11           together, tubing hangers and that type of stuff.

12      Q    Onshore and offshore or just --

13      A    Yes.

14      Q    And do you have any business partners?

15      A    I do.

16      Q    Who are your business partners?

17      A    A gentleman by the name of John Richard.

18      Q    Anyone else?

19      A    We've had a minor, minor partner with our

20           accountant.

21      Q    Who is your accountant?

22      A    Ricky LeBlanc.

23      Q    Do you have contact information for John Richard,

24           his phone number, maybe?

25      A    I do, but not --
```

```
 1   Q    Not with you?

 2   A    I can -- it's on my phone.  I can give it to you.

 3   Q    Okay.  That would be great.

 4   A    It's funny how you don't remember phone numbers

 5        or have them written down.  They're on your

 6        phone, and you've got to pull up your phone

 7        and --

 8   Q    I don't know my home phone number.

 9   A    Well, I don't, either.  Somebody asked me my

10        wife's phone number, and I said, "I don't know."

11        337-319-8938.

12   Q    Great.  Thank you.  Have you guys already formed

13        a new company, where there's an LLC or a

14        corporation?

15   A    LLC, yes.  We're re-writing the declaration right

16        now to bring him in for a minor partner -- the

17        accountant -- and redo some percentages and

18        names, who is on the LLC.  So I think you call it

19        a declaration.  It's a new thing.

20   Q    I understand.

21   A    That's mainly for the bank, but --

22   Q    All right.   What's the name of the LLC?

23   A    Johnson Energy Products.

24   Q    And does the LLC have an operating office?

25   A    It does.  Two.
```

1   Q     Where are the operating offices?

2   A     The main office, where our office is, is 110

3         Travis Street and that's Lafayette, 70508.   And

4         distribution is at 208 Row 1, Lafayette, same zip

5         code.

6   Q     It sounds like Johnson Energy is up and running.

7         Is that fair to say?

8   A     We started making sales calls and that type of

9         thing.   All of our inventory has not arrived yet.

10  Q     Have you made sales?

11  A     Sales calls?

12  Q     Sales calls.  But have you actually made any

13        sales --

14  A     No.

15  Q     -- where people have purchased product?

16  A     No.  We just --

17  Q     You just started?

18  A     Yeah.  We're just putting in computers and phones

19        and that type of thing.

20  Q     So it's May 18th.  Probably March of 2017?

21  A     I'd say -- yeah.  Well, are you talking about

22        when we actually started --

23  Q     When you started making sales calls.

24  A     Monday, the 15th.

25  Q     This Monday the 15th?

MICHAEL JOHNSON                                    5/18/2017

Page 12

```
 1   A     Yes.

 2   Q     And then -- but the LLC was started before that.

 3         Plans were being made, et cetera, to get the

 4         business going?

 5   A     That's correct.

 6   Q     And I can find that out by looking at the LLC

 7         documents, I imagine?

 8   A     Right.

 9   Q     Well, that's certainly exciting.

10   A     I'll let you know about that in about a year.

11   Q     Exactly.  It sounds like it may -- it's a good

12         opportunity.  It sounds to me like a good

13         business venture to start in this area.  That's

14         what I meant by that.  Before you began forming

15         the LLC, were you working?

16   A     I was working -- well, basically under contract.

17         But they had me on the payroll with a company

18         named RES.  They're out of Houston.

19   Q     How long did you work with RES?

20   A     Just a little bit over two years.

21   Q     Were you paid a salary or a commission or paid

22         otherwise?

23   A     A salary.

24   Q     What was your salary with RES?

25   A     I don't have that information, but it was in the
```

MICHAEL JOHNSON                                    5/18/2017

Page 13

```
 1          sixty thousand-dollar ($60,000.00) range.
 2    Q     And why are you no longer working with RES?
 3    A     Well, the -- let's see how I can best explain
 4          this.  We did bring some products to them because
 5          that was what I was brought on for, is to -- they
 6          were mainly in the field service business in
 7          Texas and Oklahoma and testing well pads and that
 8          type of stuff.  I wasn't involved with that part
 9          of it.  My job was to bring them on some products
10          to distribute, because they had none, really.
11          And so, I did that.  And so that tenure was kind
12          of over.
13    Q     They no longer needed you to bring the product to
14          them?
15    A     We brought them some.  Their direction was still
16          field service, and so the products I brought over
17          was my background.  So that was the end of that.
18          And the downturn in the industry probably didn't
19          help.
20    Q     Were you fired?
21    A     I was released, is probably the better word.  But
22          I considered it release, and my supervisor
23          considered it a release.
24    Q     You weren't fired for -- and I will confess, in
25          advance, is a legal term --
```

```
 1          your employment a little later.  How are you

 2          doing today medically-wise?

 3    A     I'm fine.

 4    Q     You're fine.  Are you taking any prescriptive

 5          drugs?

 6    A     Yes.

 7    Q     Which drugs are you on -- or prescriptions are

 8          you on?

 9    A     My wife does -- keeps track of all of that and

10          gives it to me.  So I'm on a preventive medicine

11          for seizures and I'm on a -- I guess the right

12          term would be a beta blocker for any arrhythmia

13          in my heart, or what have you, or atrial fib.  So

14          that's, for the most part, it.

15    Q     How long have you been on -- do you recall the

16          name of preventative medicine for seizures?

17    A     Keppra.

18    Q     And what's the name of the beta blocker?

19    A     Hold on.  I'm going to tell you.  I'm also on

20          Warfarin.  Oh, Propranolol.

21    Q     I see you're referencing some documents in front

22          of a binder that you have there.  What did you do

23          to prepare for today's deposition?

24    A     I'm sorry?

25    Q     What did you do today to prepare for today's --
```

MICHAEL JOHNSON                                    5/18/2017

```
 1          with a driving restriction.  Do you still have a

 2          driving restriction?

 3    A     I do not.

 4    Q     Do not.  When was the driving restriction lifted?

 5    A     I think at that date that you got that -- where

 6          he lifted -- allowed me to go back to work with

 7          that driving restriction.  It was scheduled for

 8          six months.  I didn't go six months.  I started

 9          driving myself probably four months into that.

10          And then that was probably only to go out of

11          town, that my wife wanted somebody to be with me.

12    Q     To work with RES, did you have to fill out a job

13          application?

14    A     Yes, I did.

15    Q     At that time when you began to work for RES, were

16          you still restricted from driving by Dr. Foreman?

17    A     That was in that six-month period, and I wasn't

18          restricted at that time, best of my knowledge.

19          But I still had somebody with me, not all the

20          time, but some of the times.

21    Q     Who would accompany you?

22    A     Mostly my brother-in-law, who is retired.

23    Q     And he would ride along with you or he would

24          drive you?

25    A     Both.
```

1    Q    Both.  But as you stated, that was just when you

2         went out of town?

3    A    For the most part.  You know, now early in that

4         six-month restriction, he did take me to work and

5         come pick me up.  But that wasn't all the time.

6         Just some of the time.  So --

7    Q    And with RES, if I understand your position, you

8         were bringing the products to RES?  RES was the

9         sole customer, for lack of a better term; is that

10        correct?

11   A    Yes.

12   Q    Let's jump back into your medical history a

13        little bit so I can understand what conditions

14        you had in the, you know, 2010 through now sort

15        of time frame.  I understand you had a brain

16        bleed or a brain aneurism.  What condition did

17        you have?

18   A    The best way I can explain it is I had gotten on

19        a new blood thinner, got off the Warfarin.  I got

20        on Xarelto, which is one of these new ones that

21        you don't have to go get checked every month to

22        see how thin your blood is or how thick it is.

23        You're not limited on diet.  You can eat all the

24        greens you want, and so I thought that was a good

25        idea.  I consulted my doctor at the time, which

MICHAEL JOHNSON                                        5/18/2017

```
 1              month and a half after switching to the Xarelto

 2              -- is when you had the intracranial bleed or the

 3              brain bleed; is that correct?

 4       A      That's correct.

 5       Q      Did you undergo any surgeries for the

 6              intracranial bleed?

 7       A      I did.

 8       Q      What type of surgery did you undergo?

 9       A      It was surgery that penetrated the skull so they

10              could remove the clot.

11       Q      And who performed that surgery?

12       A      Dr. Day.  He did the surgery at Memorial Hermann

13              in Houston.

14       Q      And how long were you off of work after that

15              surgery?

16       A      Total, I would say five weeks.

17       Q      Did you take FMLA leave while you were on that --

18              off for that surgery?

19       A      Repeat that question?

20       Q      Sure.  Did you take family medical leave while

21              you were off?

22       A      Yes.

23       Q      Was that facilitated by Setpoint?

24       A      Well, I assume so.  I had medical leave and

25              probably ate up some vacation time, which is
```

MICHAEL JOHNSON                                    5/18/2017

```
 1              probably all tied together.

 2    Q    Yeah.  Your vacation time maybe ran at the same

 3         time as your FMLA leave?

 4    A    Right.

 5    Q    So you received a paycheck while you were on

 6         leave?

 7    A    Right.

 8    Q    Okay.  Did you receive any other benefits from

 9         Setpoint during that five-week period?

10    A    Not that I recall.

11    Q    When you returned from the five weeks post-

12         surgery to Setpoint, were you given any

13         restrictions at all?

14    A    Only the driving restrictions that we talked

15         about earlier.

16    Q    Let me show you a document that might help.  I'm

17         aware of a driving restriction that was issued in

18         January of 2014.  I'm not aware of a driving

19         restriction in 2013.

20    A    I think what had happened, I just went back to

21         work.  And I don't think I was asked for

22         something from Foreman until after that.

23    Q    When you returned after the five-week surgery,

24         were you able to perform your job?

25    A    Yes.
```

1  Q    Any complaints from anybody?

2  A    Not to my knowledge.

3  Q    Okay.  Fair.  Did you suffer or undergo another

4       event while at work attributable to the brain

5       surgery that occurred in April of 2013?

6  A    I had a couple of events.

7  Q    Can you describe those for me?

8  A    Yes.  So one of them -- and I don't have the

9       dates.  But one of them was a seizure activity,

10      but it wasn't anything compared to the one I had

11      when all of this started in 2013.  It was -- I

12      think they term it as a focal seizure.  And I was

13      out probably another day and a half, something

14      like that.

15 Q    When you had the focal seizure, did you go see a

16      doctor?

17 A    I did.

18 Q    Which doctor did you see at that point?

19 A    Foreman.

20 Q    And he told you were fine to go back to work?

21 A    He, yes, told me to rest for a couple of days and

22      continue on.

23 Q    And then did you suffer another event?

24 A    If I did, very minor.  And I did, very minor.

25      You know, they were just zoned out for 20

 1          minutes, maybe, or ten minutes.  So --

 2     Q    Was that at work?

 3     A    Not to my knowledge.

 4     Q    The first, what was described as a focal seizure,

 5          did that occur at work?

 6     A    Yes.

 7     Q    Was an ambulance called to assist?

 8     A    Yes.

 9     Q    Do you recall the date that occurred?

10     A    I do not.

11     Q    Do you recall the year?

12     A    2014.

13     Q    Do you recall the month?

14     A    No.

15     Q    And then a subsequent event, meaning another

16          event happened.  But you don't think it was at

17          work?

18     A    Right.

19     Q    It was more zoning out for 20 or 30 minutes?

20     A    Probably closer to ten minutes.

21     Q    Ten minutes.  Okay.

22     A    Yeah.

23     Q    The first -- and I'm sorry I'm skipping around.

24          But the first time you went to the hospital for

25          brain surgery -- or that ultimately resulted in

MICHAEL JOHNSON                                5/18/2017

Page 28

```
 1           believe, is what you said?

 2    A      I did.  But thinking back, I think my wife came

 3           and picked me up and we went straight to Dr.

 4           Foreman's office.

 5    Q      And he told you to rest for a few days?

 6    A      Rest for a couple of days.

 7    Q      A couple of days.

 8    A      And they adjusted my medicine.

 9    Q      Did they increase or reduce the dosage?

10    A      They increased.

11    Q      And this would have been the preventative

12           medicine for seizures, the Keppra?

13    A      That's correct.

14    Q      Following the event, the second event that

15           occurred at work that your wife brought you to

16           Dr. Foreman's office, it's my understanding that

17           Setpoint requested a return-to-work clearance or

18           a receipt; is that correct?

19    A      Best of my knowledge, yes.

20    Q      And that is when Dr. Foreman released you to

21           work, except for driving?

22    A      That's correct.

23    Q      Do you know why Dr. Foreman restricted you from

24           driving?

25    A      That is general policy by doctors.  That is not a
```

MICHAEL JOHNSON                              5/18/2017

```
 1              law in the state of Louisiana.  There's no law

 2              that says you've got to -- after an event like

 3              that, you've got to not drive for six months.

 4              That's generally what doctors, I guess, know how

 5              -- I guess to just say that's common practice --

 6              probably like to see that.  So --

 7     Q    Is that what Dr. Foreman told you?

 8     A    He didn't tell me that, but that's what I know.

 9              And he -- and I might have mentioned that to him

10              and he said, "Yes, you know, that's correct.  But

11              we would like to see you not drive for six

12              months."

13     Q    How do you know that?

14     A    How do I know what?

15     Q    That there's a law that says you can drive -- you

16              said that there was a law that says --

17              MR. HEBERT:

18                   I believe he said there was no law.

19              MR. FERACHI:

20                   No law?

21     BY MR. FERACHI:

22     Q    How do you know that there's no law that

23              restricts you from driving after a seizure?

24     A    To me, it was common knowledge.

25     Q    I don't recall on the release-to-work slip that
```

```
 1                         seen.

 2              MR. FERACHI:

 3                    Yeah, isn't it?

 4              MS. CURRIE:

 5                    Yeah.

 6              MR. HEBERT:

 7                    Yeah, we're rejoicing.

 8    BY MR. FERACHI:

 9    Q    Mr. Johnson, please take a second to look at that

10         document.

11    A    Okay.

12    Q    Do you recognize it?

13    A    Yes.  That was the -- it's on the prescription.

14         I remember him writing this and giving it to us

15         to -- I believe it was requested by Brandy, to my

16         knowledge.  And so, that was given back to

17         Setpoint, so -- to document that I was cleared to

18         go back to work, but except driving, just like it

19         says.

20    Q    And just to read it, it says, "Mr. Michael

21         Johnson is cleared to return to work at full

22         duty, except driving."  Did I read that

23         accurately?

24    A    Uh-huh (affirmative response).

25    Q    Yes?
```

1    A    Yes.

2    Q    And this is from, it looks like, Dr. Adam

3         Foreman; is that correct?

4    A    Yes.

5    Q    And on this "return slip," I'll call it, there's

6         not an exception or a description of six months

7         anywhere -- that says you're only restricted for

8         six months; is that correct?

9    A    The conversation that I had with Dr. Foreman was

10        six months is the common practice.

11   Q    Okay.  I don't -- I'm not questioning that

12        conversation.

13   A    Right.

14   Q    I'm just asking on this return-to-work slip,

15        there's no mention of six months?

16   A    No.

17   Q    Can you put that aside?  We're going to come back

18        to it later, but put it on the side for now.

19   A    (Witness complies.)

20             MR. FERACHI:

21                  The next document I'm going to show

22             you, I'm going to list as "Exhibit 2."  And

23             I'll represent to you that it is a

24             Certification of Health Care Provider for

25             Employee's Serious Health Condition under

MICHAEL JOHNSON                                        5/18/2017

```
 1                    the Family Medical Leave Act.

 2                    (EXHIBIT NO. 2 IDENTIFIED)

 3   BY MR. FERACHI:

 4   Q     I'll show it to you.  Would you agree that this

 5         is an FMLA certification document?  Take your

 6         time to look through it.

 7                MR. HEBERT:

 8                    Let me just, for the record, object to

 9                the form of the question on the grounds

10                that it calls for a legal conclusion, as

11                posed.  But subject to the objection, just

12                do the best you can to answer the question.

13                THE WITNESS:

14                    Repeat the question?

15   BY MR. FERACHI:

16   Q     Let me ask it a different way because your

17         counsel's objection is appropriate.  Do you know

18         what this document is?

19   A     I don't recall seeing it before or studying it

20         before.

21   Q     All right.  If you turn to the last page, you

22         will see what I'll represent is a signature of

23         health care provider and a date of August 1st,

24         2013.  Do you recognize that signature?

25   A     I don't.
```

1   Q      Were you being seen, at that time, by Dr. Jason
2          Cormier?
3   A      I don't -- I do not remember my last visit with
4          Dr. Cormier.  I had one, I'm sure, but I don't
5          remember the date.
6   Q      If you turn to page two, there's a description of
7          medical facts that show dates of treatment, dates
8          of surgery, and probable duration of condition.
9          And under "Probable Duration of Condition," under
10         number one, it states, "Patient returned to work
11         on July 11, 2013."  Is that about the time you
12         remember returning to work following the
13         intracranial bleed surgery?
14  A      I would say that's correct.
15  Q      All right.  Under number three, there's a check
16         mark near the sentence that says, "Is the
17         employee unable to perform any of his/her job
18         functions due to the condition?"  And it's
19         checked "No."  Do you see that?
20  A      Uh-huh (affirmative response).
21  Q      Yes?
22             MR. HEBERT:
23                 You have to answer it in words,
24             remember?  You just said "uh-huh" just now.
25             THE WITNESS:

1                    Oh, I'm sorry.

2    BY MR. FERACHI:

3    Q     Yes?

4    A     I do.  Yes.

5    Q     You can see that?  Okay.  And it's written

6          underneath that, it says, "Not any more"; is that

7          correct?

8    A     That's correct.

9    Q     So do you interpret that to mean -- and this is

10         your opinion after reading this -- that at some

11         point you were unable to perform your functions,

12         but now you are able to perform the functions of

13         your job?

14               MR. HEBERT:

15                    I'm going to object to the form.  It

16               calls for speculation as to what the author

17               intended.  But subject to the objection,

18               you can answer.

19               THE WITNESS:

20                    While I was out, I was unable to

21               perform the duties.  But when I came back

22               to work, which -- I was able to perform all

23               duties that it required in my position.

24    BY MR. FERACHI:

25    Q     On page three, number seven, the sentence -- the

MICHAEL JOHNSON                                    5/18/2017

```
 1          that required you to be absent from work?

 2     A    I would say the chances of that are slim.

 3     Q    I'm sorry.  Not the chances now.  But in 2014 you

 4          did have a subsequent seizure that required you

 5          to be absent from work for more than one day?

 6     A    I think that did occur.

 7     Q    Put that one with Number 1 because we're going to

 8          come back to it later this morning, too, probably

 9          not in the order I gave it to you, unfortunately.

10     A    (Witness complies.)

11     Q    When were you first employed by Setpoint?

12     A    Did you ask a question?  When was I --

13     Q    I'm sorry.  When were you first employed by

14          Setpoint?

15     A    I was first employed by Carter Chambers, which

16          became part of Setpoint after the merger of DMC

17          to Carter Chambers.  That employment was in 1999.

18     Q    What was your original position with Setpoint?

19     A    Again, Carter Chambers --

20     Q    I'm sorry.  Is it okay if I use Setpoint

21          interchangeably with Carter Cambers?

22     A    Right.

23     Q    DMC-Carter Chambers?

24     A    Right.

25     Q    And, finally, Setpoint?
```

MICHAEL JOHNSON                                                5/18/2017

```
 1    A      Okay.  My original position was to put Carter
 2           Chambers in the oil and gas industry.  So I wore
 3           multiple hats.  Manager of the Lafayette
 4           facility, getting products into that marketplace
 5           with them, making sales calls.  I mean, I wore
 6           every hat there.  And then starting to hire
 7           people as the business grew.
 8    Q      Who hired you into Carter Chambers or to
 9           Setpoint?
10    A      Tom Felter.
11    Q      So it appears you were hired in because of your
12           experience in the oil and gas industry.  Who did
13           you work for before going with Setpoint?
14    A      I worked for Breard-Gardner.  I went to work for
15           them in 1981.
16    Q      What was your final position with Breard-Gardner?
17    A      Product manager.
18    Q      What was your final position with Setpoint?
19    A      Product manager for the oil and gas side of the
20           business.
21    Q      How many product managers were there on the oil
22           and gas side of the business when you stopped
23           working with Setpoint?
24    A      I was their only one.
25    Q      How many product managers are there, company-
```

1              wide, for Setpoint?

2     A        At that time I would say at least eight, maybe as

3              much as ten.

4     Q        Did those product managers have anything to do

5              with the oil and gas side of the business?

6     A        They did.

7     Q        They did.  Explain to me their role within the

8              oil and gas side of the business.

9     A        Their participation was minimal and it only

10             applied to a couple products.

11    Q        I'm going to work back with you through your

12             history with Setpoint.  You were a product

13             manager beginning when?  What year?

14    A        When I started.

15    Q        Oh, you've always been a product manager?

16    A        Always been a product manager.

17    Q        It makes it a lot easier.  We won't have to go

18             through a lot of job descriptions.  What do you

19             do as a product manager?  Tell -- this is your

20             chance to tell the jury what you did as a product

21             manager.

22    A        The typical role of a product manager was to

23             identify products that are needed in your

24             business, to take those products to market via

25             account managers, work with the manufacturers on

MICHAEL JOHNSON                                    5/18/2017

Page 41

```
 1            any type of special arrangement, whether it be
 2            price, deliveries, or whatever.  So you're
 3            supporting the account managers.  And that's the
 4            typical role.  I've simplified it, but that's it.
 5            And so training is involved with that a lot and
 6            what have you.  And also helping them identify
 7            opportunities with their particular customers as
 8            these new products come into play.
 9   Q        Anything else?
10   A        You also spend time with the service manager in
11            the oil and gas side of the business to parlay --
12            if they're having real success in the service
13            side, but we're not having product success in
14            those accounts, we try to help each other to
15            change that.  And it goes to the other side of
16            the street, too, where you're having product
17            success but you're not having service success.
18            You try to help bridge that.
19   Q        Anything further that you would do as an account
20            manager -- product manager?  I'm sorry.
21   A        I would think that's the long and short of it.
22   Q        What was a typical day like for you?
23   A        I think lining up what I just told you, that had
24            a lot to do with the conversations you would have
25            with the manufacturers, conversations you would
```

MICHAEL JOHNSON                    5/18/2017

```
1              have with the account managers, all of that.
2              That's what the day was all about, what I just
3              described previously.
4     Q        To support the account managers, did you have to
5              drive?
6     A        I had to travel some, but not -- it wasn't a
7              continuous deal.  Probably only maybe ten percent
8              of my time was having to actually go get with
9              them or what have you, travel to their location
10             or what have you.  A lot of this was handled via
11             phone communication, emails, that type of thing.
12    Q        Did you have to travel to customer sites to do
13             product demonstrations?
14    A        Yes.
15    Q        Did you have to travel to customer sites to do
16             lunch and learns?
17    A        Yes.  Well, excuse me.  Participate, possibly, in
18             a lunch and learn.  The account managers
19             generally line that up.  And they may want you to
20             come in if that focus of that lunch and learn was
21             your product or what have you.
22    Q        Would you have to enter chemical plants at all to
23             do part of your work?
24    A        I stayed out of plants, period.
25    Q        What were some of your customers?
```

MICHAEL JOHNSON                                    5/18/2017

```
 1   A    I paid particular attention to Chesapeake because

 2        that was one of our largest oil and gas clients

 3        and it was one that I probably started with of

 4        introducing the company to Chesapeake.  I had

 5        relationships there, so I paid particular

 6        attention to them.

 7   Q    Where is Chesapeake located?

 8   A    Their headquarters is in Oklahoma City, but their

 9        field locations are all over.

10   Q    Would you make calls to their locations?

11   A    Yes.

12   Q    Would you go to Oklahoma City?

13   A    Yes.

14   Q    When you went to Oklahoma City, did you fly or

15        drive?

16   A    Drove.

17   Q    Do you ever fly?

18   A    No.  I didn't.  Typically then, I didn't.

19   Q    Then, you did not, right?

20   A    Not since I worked for Setpoint.

21   Q    Where were some of the field locations for

22        Chesapeake?

23   A    Dallas/Fort Worth area, north Louisiana.  That

24        was the primary locations that I actually went

25        to.
```

MICHAEL JOHNSON                           5/18/2017

1     You would orchestrate bringing them in to do a

2     technical presentation.  Some products I did do

3     the technical presentation.  It was just

4     depending on the product.

5  Q   Would you have a direct interface with the

6     manufacturer?

7  A   Oh, that was -- absolutely.

8  Q   Would you contribute to the inventory of the

9     product, making sure the right amount of

10    inventory was there to supply to customers?

11  A   Yes.

12  Q   Would you participate in strategic planning for

13    that product or for getting that product to

14    different customers?

15  A   Yes.

16  Q   Who was your direct supervisor as a product

17    manager in 2014?

18  A   Bill Kiteley became that right after Dan Bosse's

19    termination.  And I don't have the date of that.

20    You might know.

21  Q   So Bill Kiteley was your direct supervisor

22    immediately after Dan Bosse left Setpoint?

23  A   Correct.

24  Q   Who was your supervisor before Dan Bosse?

25  A   That's the only one I ever had with Setpoint.

MICHAEL JOHNSON                                    5/18/2017

Page 50

```
 1          demonstration at their location.

 2     Q    At whose location?

 3     A    The customer.

 4     Q    The customer's location?

 5     A    Right.

 6     Q    Okay.  Did you fill out expense reports in your

 7          job as a product manager?

 8     A    I did.

 9     Q    Did you fill out expense reports weekly or

10          monthly?

11     A    Monthly.

12     Q    Have you ever falsified an expense report?

13     A    No.

14     Q    What would happen if you did falsify an expense

15          report?

16     A    I would suspect I'd get terminated.

17     Q    Did you have a company gas card?

18     A    I did.

19     Q    Was that billed to you or was it billed directly

20          to the company?

21     A    It was billed to the company.

22     Q    Did you have a card specific to you, where it had

23          "Michael Johnson" on it?

24     A    Yes.

25     Q    Did you have to fill out any reports with regard
```

MICHAEL JOHNSON                                    5/18/2017

```
 1          to the gas card?

 2     A    No.

 3     Q    And the gas cards, as I understand them, are for

 4          official use only, company business only; is that

 5          correct?

 6     A    That's correct.

 7     Q    Did you ever use the gas card for non-company

 8          business?

 9     A    No.

10     Q    For family vacations or trips or anything?

11     A    I used my own credit card for that.

12     Q    And, again, what would happen if you used the gas

13          card for a non-business reason?

14     A    Say that again?

15     Q    What would happen, in your opinion, if you used

16          the gas card for non-business reasons?

17     A    I would think you would get at least a reprimand.

18     Q    Did you ever know anyone at Setpoint to be

19          reprimanded or fired for improper use of the gas

20          card?

21     A    No.

22     Q    Did you ever know anyone at Setpoint who was

23          fired or reprimanded for falsifying expense

24          reports?

25     A    No.
```

MICHAEL JOHNSON                                5/18/2017

Page 52

1   Q   Did you keep a copy of your expense reports

2       during your employment with Setpoint?

3   A   I did.  And we went -- but we went to a -- I

4       guess you would call it maybe an automated

5       expense report, where you went into the computer

6       and did it.  And so, that was on the computer.

7       You know, I don't remember any hard copy once we

8       went to that system.

9   Q   Purely as an example.  If you went to Dallas to

10      see Chesapeake and you took some Chesapeake folks

11      out to lunch, that is an example of something

12      that I would see on your expense report, correct?

13  A   Right.

14  Q   And would you say -- would you detail it as far

15      as "Lunch with Chesapeake in Dallas, Texas"?

16  A   Right.  And the names of who you took to lunch.

17  Q   Yeah.  I know that all too well.  The purpose of

18      my question really is to confirm that if you are

19      traveling out of town for business and put that

20      on your expense report, you would note the city

21      and state that you are in in your expense report,

22      correct?

23  A   Yes.  And you would -- I would put, you know,

24      "out of town," wherever you went, you know,

25      whether it be a lunch or a dinner you had that

MICHAEL JOHNSON                                    5/18/2017

```
 1              night just with our customer.  So I'd put that
 2              meal out of town in Houston.
 3    Q    And the gas card is a little different because it
 4              went straight to the company.  But would you
 5              expect it to show what location you were when you
 6              were filling up the vehicle?
 7    A    No.
 8    Q    You wouldn't expect it.  Did you ever see recaps
 9              of your expense reports or any kind of
10              spreadsheet that would show your expense reports?
11    A    No, sir.
12    Q    What about with your gas card, did you ever see
13              any sort of recap of your gas card usage?
14    A    No.
15    Q    Did you, in your position as product manager,
16              travel to Baytown, Texas a good bit?
17    A    No.
18    Q    You did not?  Did you ever travel to Baytown,
19              Texas?
20    A    I might have went through there going to
21              somewhere.  But specifically going to Baytown, I
22              can't recall that.
23    Q    Did you travel to Houston in your position as
24              product manager?
25    A    Quite a bit.
```

MICHAEL JOHNSON                              5/18/2017

```
 1   Q    Quite a bit.  Meadow, Texas?  Have you ever been
 2        to Meadow, Texas, that you're aware of?
 3   A    I don't know where that's at, but I might have
 4        been through there.
 5   Q    Okay.  That's fair.  Did you ever have a month
 6        where -- and this is, let's say, from 2010 to
 7        2014.  Absent the time that you were in the
 8        hospital, did you have a month where you did not
 9        turn in an expense report, you had no client
10        entertainment or no business?
11   A    That might have been the month or whatever that I
12        was out.  That's the only thing I can imagine.
13   Q    Otherwise, monthly, you had some expenses to turn
14        in?
15   A    Oh, absolutely.
16   Q    You were going to see people, you were doing
17        things, entertaining?
18   A    Right.
19   Q    Correct?
20   A    Correct.
21   Q    Part of your job, correct?
22   A    Correct.
23   Q    Excuse me for a second.  I have to lift the chair
24        off my cord.  And what about with RES, the person
25        or the company that employed you immediately
```

MICHAEL JOHNSON                                    5/18/2017

1        after Setpoint, when did you become employed by

2        RES?

3    A   May 2014, I want to say.

4    Q   And when did you guys part ways?

5    A   June of '16, I want to say.

6    Q   Just yesterday or the day before yesterday, I was

7        provided some information that indicates that it

8        was, in fact, June of 2016.  That sounds

9        accurate?

10   A   Yes.

11   Q   Okay.  I believe you told me earlier today that

12       you filled out a job application with RES; that

13       is correct?

14   A   Yes.

15   Q   On that application, did you list that you were

16       -- your driving was restricted by your doctor?

17   A   Not that I recall.

18   Q   Do you know that if on that application there was

19       a question whether you had any restrictions?

20   A   I don't recall.

21   Q   Given that you were going to have to drive to

22       RES, did you not think it important to let them

23       know that you were under a restriction from your

24       doctor for driving?

25   A   I think my supervisor knew that.

MICHAEL JOHNSON                                5/18/2017

```
 1          trip with Mr. Kiteley?
 2   A      I don't have that information, but I -- if you
 3          say so, that's when it was.
 4   Q      I don't want to -- I can't testify on your
 5          behalf.
 6   A      That sounds right.
 7   Q      I'm trying to nail down some dates.
 8   A      I understand.
 9   Q      And you believe, at that time, you mentioned to
10          Bill -- or to Mr. Kiteley that you couldn't drive
11          for six months?
12   A      I don't remember specifically mentioning to him a
13          time frame that I was there -- or could drive.
14          He knew it because my brother-in-law dropped me
15          off at the office, and then Bill and I ride --
16          rode back to Lake Charles together just to have
17          conversation, and my brother-in-law picked me up
18          in Lake Charles.
19   Q      Did you ever tell -- we mentioned the name Brandy
20          earlier.  And I failed to include her last name,
21          Brandy Piazza and now Mulherin.  Did you ever
22          mention to Ms. Piazza that you are restricted for
23          six months?
24   A      I didn't.  I think my wife did.
25   Q      You do think your wife did?
```

MICHAEL JOHNSON                                    5/18/2017

```
 1   A     I know, in the beginning, several did that were

 2         on the DMC side.  But, again, I think at one

 3         period of time they rented an office suite down

 4         the road from their location now and several of

 5         the product managers were housed there.  And

 6         that's all I remember about that.  I didn't

 7         interface with quite a few of the product

 8         managers on the other side because their products

 9         didn't migrate into the oil and gas side of the

10         business.  So, other than seeing them at meetings

11         or whatever, I didn't have any interaction with

12         them.

13   Q     In 2013 and 2014, are you aware of any product

14         managers who worked from their house?

15   A     I don't recall any names.  I did understand that

16         when DMC was not part of Carter Chambers or

17         merged together, that I've heard that -- it's

18         hearsay.  I've heard that several of them did

19         work from their homes.

20   Q     But for timing purposes, the DMC-Carter Chambers

21         and Setpoint merger occurred before 2014,

22         correct?

23   A     Oh, yes.

24   Q     It occurred before 2013, even?

25   A     Correct.
```

MICHAEL JOHNSON                                    5/18/2017

```
 1   Q    So as far as 2013 and 2014, we're not concerned
 2        with DMC-Carter Chamber product managers any
 3        more.  Everyone is a Setpoint product manager,
 4        correct?  Is that correct?
 5   A    Say that again now?
 6   Q    In 2013 and 2014 all of the product managers are
 7        now Setpoint -
 8   A    Right.
 9   Q    -- employees, correct?
10   A    Right.
11   Q    And those product managers were not working from
12        home?
13   A    I don't know that.
14   Q    You don't know?  Okay.  That's fair.  We looked
15        at Exhibit 2 earlier.  And on Exhibit 2, we paid
16        attention to number three where there's a check
17        mark that said you could now do your work.  You
18        were no longer unable to do your job.  Do you
19        recall that?
20   A    I'm looking at it.
21   Q    Yeah.  And that was in 2013, correct?
22   A    That's what it says, yes.
23   Q    Do you know who gave this form to Dr. Cormier in
24        2013?
25   A    No.
```

MICHAEL JOHNSON                              5/18/2017

Page 63

```
 1   Q    With regard to "not any more," do you know when

 2        it changed from you being unable to perform the

 3        functions of your job to being able to perform

 4        the functions of your job?

 5   A    The only time that I couldn't perform the

 6        functions of my job was when I was out in the

 7        process of surgery.

 8   Q    Okay.  And, indeed, when you were released -- or

 9        the date of anticipated release from this FMLA

10        paperwork shows that you were indeed able to now

11        perform the duties of your job upon return,

12        correct?

13   A    Yes.

14   Q    However, in 2014, after an episode that occurred

15        at the work site that required your wife to bring

16        you to Dr. Foreman's house, if we turn back to

17        Exhibit 1, we see that you are released to full

18        duty, except for driving.  We've discussed this

19        already, correct?

20   A    Right.

21   Q    Why did Dr. Foreman -- or do you know why Dr.

22        Foreman considered driving part of your duties at

23        work?

24   A    I assume we told him that I needed to drive on

25        occasions.
```

MICHAEL JOHNSON                                      5/18/2017

Page 64

```
 1   Q    Do you remember telling him the amount of
 2        occasions in which you had to drive?
 3   A    No.
 4   Q    Did you discuss alternatives to driving with Dr.
 5        Foreman?
 6   A    Yes.
 7   Q    What alternative did you discuss with Dr.
 8        Foreman?
 9   A    I told him I was very blessed that my brother-in-
10        law lived right behind me and he was retired, so
11        any driving -- or any time I needed to get
12        somewhere that required getting there -- that he
13        would be driving me.
14   Q    Did you ever receive a certificate or any final
15        release from Dr. Foreman that says you're capable
16        of working a full duty period?
17   A    Not to my knowledge.
18   Q    And RES did not request one, correct?
19   A    That's correct.
20   Q    I believe it is safe to assume that your current
21        venture, Johnson Energy Products, did not request
22        a release from your doctor that you could work --
23        that you could drive; is that correct?
24   A    That's correct.
25   Q    And as we sit here today, like you told us
```

MICHAEL JOHNSON                          5/18/2017

```
 1              before, you're fully capable of driving, going

 2              wherever you need to go, that your medication is

 3              controlling your seizures?

 4    A    Yes.

 5    Q    Have you had any other events since January of

 6              2014?

 7    A    Not that I -- no.  Not --

 8    Q    No other seizures --

 9    A    If I had it --

10    Q    -- since then?

11    A    -- I was sleeping.

12    Q    That's fair.  Any other -- I'll ask it another

13              way just so we're clear on the record.  Have you

14              had any other seizure events that have required

15              you to miss any days of work?

16    A    No.

17    Q    Have you had any other medical events, not

18              seizure related, that have caused you to miss a

19              day of work?

20    A    No.

21    Q    How did you come to find out about RES as a

22              potential employer?

23    A    Through an acquaintance that knew Bill Walton,

24              who is a sales manager for RES.

25    Q    Did you negotiate your salary with RES?
```

```
 1   A     I don't remember negotiating.  It was an offer.
 2         So I don't think there was any negotiating there
 3         at all.
 4   Q     If my calculations are correct, you were not
 5         employed by Setpoint for about one month, April
 6         of 2014 to May of 2014?
 7   A     I don't remember exactly the dates.  I think it
 8         was six months before I went to work for RES
 9         after I was terminated.  That's approximate, to
10         me.
11   Q     When do you believe you were terminated from
12         Setpoint?
13   A     I want to say February of '14, something in that
14         neighborhood.  That's a guess.
15   Q     If you had an opportunity to be re-employed by
16         Setpoint, would you accept reemployment?
17   A     No.
18   Q     Why not?
19   A     I just -- I'm not familiar with the current
20         management of Setpoint that well.  Well, I know
21         Jack Guidry.  And, quite frankly, I think I was
22         treated unfairly.
23   Q     Does it have anything to do with the fact that
24         you're pursuing another career path right now?
25   A     Very little, if any, because I felt that I
```

```
 1              needed to do something.  And, you know, the way

 2              the industry is and some opportunities that

 3              have recently come up may let me do my own thing.

 4              So --

 5     Q    What kind of opportunities have recently come up?

 6     A    A couple of product lines have offered some

 7              advantages in inventory being available at little

 8              or no cost.  And so, that's a big expense.  And

 9              so that, you know, allows me to not have to

10              invest a lot of up-front money to get started.

11     Q    Do you have any projections on income from

12              Johnson Energy?

13     A    I hadn't tried to put a number to it right now.

14     Q    While you may not have projections, do you have

15              any anticipation of what you -- what type of

16              profits you may be able to make with Johnson

17              Energy?

18     A    I would hope that sales would be in the two

19              million-dollar ($2,000,000.000) range the first

20              year.  And I would hope that we could manage, in

21              some form or fashion, a 20 percent profit margin

22              off of those.  That would be gross profit, not

23              bottom line after expenses.

24     Q    As we sit here today, do you feel you are 100

25              percent employable?
```

MICHAEL JOHNSON                              5/18/2017

Page 68

```
 1   A     Yes.

 2   Q     While employed by RES, were you seeking out any

 3         other employment opportunities?

 4   A     I was looking for any opportunity that might come

 5         because I knew that the RES thing was going to be

 6         a short term -- you know, a short term deal.

 7   Q     What did you do to look?

 8   A     Just network people.

 9   Q     Can you tell me any specific people you spoke

10         with?

11   A     Former -- or customers, you know, former

12         customers, business associates that I had had

13         contact with over time.  I talked to a few

14         similar companies to Setpoint, you know, like the

15         AWCs of the world and John H. Carter and people

16         in the industry like that.

17   Q     Can you give me any names of former customers you

18         spoke with about employment?

19   A     You're talking about customers that I might have

20         talked to?

21   Q     Yeah.  You said you went through a network of

22         people to look for opportunities because you knew

23         RES was going to be short time job.  One of the

24         categories you listed were former customers.

25   A     Right.
```

1    Q    Can you tell me which former customers you spoke

2         with?

3    A    Oh, man.  I&E Technology, I mean Ardent.  There's

4         just -- there's 13 or 14 system integrator houses

5         in Lafayette.  And I contacted all of them to see

6         if there are any opportunities come up, because

7         they get people coming in their door all the time

8         that may need somebody in the area or what have

9         you.  So, you know, and this area here,

10        Lafayette, is really a small community in a lot

11        of ways.  And so -- and I've been here for over

12        30 years, 35, and so I know a lot of people.  And

13        so just, you know, talk to everybody you can talk

14        to.

15   Q    Can you name an individual of any of the former

16        customers you spoke with?

17   A    Chad Mercke at I&E Technology.  Mike Clayton at

18        Ardent, A-R-D-E-N-T.

19   Q    How about business associates, can you name any

20        individual business associates you discussed job

21        opportunities with?

22   A    Say that again?

23   Q    Sure.  Another one of the categories you gave me

24        of people you discussed opportunities with,

25        because you knew RES was going to be short time

MICHAEL JOHNSON                                    5/18/2017

```
 1              job, were business associates.  Can you name me

 2              any individual business associates you discussed

 3              work with?

 4    A    Yeah.  The companies that I've named, like other

 5              companies like Setpoint, similar, BBP, AWC.

 6    Q    Do you recall the actual individuals you spoke

 7              with there, though?

 8    A    Troy Romero with BBP.  I don't recall the

 9              gentleman's name.  He's vice-president with AWC.

10              John H. Carter, Bruce Lowery.

11    Q    Anybody else you can remember?

12    A    Not right off the top of my head.

13    Q    What are your, as we sit here today, current

14              sources of income?

15    A    Savings account.

16    Q    Have you ever applied for workers' compensation

17              in your career?

18    A    No.

19    Q    Have you received any social security disability

20              payments?

21    A    No.

22    Q    Have you received any social security indemnity

23              payments?

24    A    No.

25    Q    Currently, are you receiving any rental income?
```

MICHAEL JOHNSON                                    5/18/2017

```
 1        was short term.  How did Setpoint know that this

 2        was a short term issue?

 3   A    I would think by the information that they were

 4        getting, the documentation that the investigating

 5        -- or hearing it -- of what the doctors were

 6        saying, understanding a little bit more about

 7        what had happened.  I think that that would be

 8        part of their job.

 9   Q    What we know they did receive was the Exhibit 1,

10        which was the return to full duty except driving,

11        correct?

12   A    That's correct.

13   Q    Okay.  Do you have any evidence that Setpoint

14        received information that would indicate

15        returning to drive -- returning to full duty

16        except driving for six months?

17   A    I don't know if they got any written, but I know

18        that verbally that I talked to my supervisor,

19        Bill Kiteley, and said, "This is a short term

20        issue.  Hopefully, I'll get back," you know,

21        "within those guidelines."

22   Q    And I think we talked about that earlier.  That

23        was before January of 2014 when we received this

24        release.  When we received this -- when Setpoint

25        received this release, there wasn't a -- there
```

MICHAEL JOHNSON                                    5/18/2017

Page 93

```
 1              on more than one occasion asking that it'd be
 2              filled out by your treating physician, correct?
 3    A    I don't know how many times.
 4    Q    Was it more than once?
 5    A    I don't know.
 6    Q    We know at least one time --
 7    A    Well, at least one time they obviously did.
 8    Q    Did you ever reach out to someone at Setpoint
 9              asking more information about benefits that you
10              had during the time you were out?
11    A    I didn't have any communication with them.  My
12              wife did.
13    Q    You did not personally have communication with
14              Setpoint asking about benefits?
15    A    Uh-uh (negative response).  I didn't.
16    Q    Did you ask about FMLA leave or any compensation
17              you could receive during leave?
18    A    I don't recall any.
19    Q    Did you personally ask anyone at Setpoint for an
20              accommodation for your driving?
21    A    Not at Setpoint.  Maybe -- on one occasion I do
22              remember there was a meeting in Shreveport with
23              Chesapeake and one of the sales guys that called
24              on Cheasapeake in Pennsylvania, I asked him to go
25              with me because he may pick up on something since
```

```
 1            what we were doing in north Louisiana could be
 2            parlayed into Pennsylvania, and I said, "I'll
 3            just ride with you."  And so, that was the only
 4            time that I remember me riding with a Setpoint
 5            account manager any time, other than making sales
 6            at a location or from a location.
 7       Q    What was the date of that travel?
 8       A    Oh, no.  I can't recall that.
 9       Q    After January of 2014, did you ask anyone at
10            Setpoint for any accommodations with regard to
11            your driving?
12       A    Other than what I just said, no.
13       Q    Other than what you just said --
14       A    No.
15       Q    -- and before -- accommodations before 2014 with
16            Mr. Kiteley?
17       A    No.
18       Q    You never requested that, correct?
19       A    Correct.
20       Q    Do you recall filing a charge with the Equal
21            Employment Opportunity Commission regarding your
22            claims against Setpoint?
23       A    My attorney did that.
24       Q    Do you recall an initial letter from your counsel
25            to the EEOC to start that process?
```

1           were going to proceed with it.

2    Q      Turn, if you can, to page four of that letter.

3    A      (Witness complies.)

4    Q      Is that your signature?

5    A      It is.

6    Q      And does this change your mind on whether or not

7           you reviewed this document before you signed it?

8    A      I was told what it said and I probably glanced

9           over it.  But to actually say I studied it and

10          read it is not true.  So I did sign it.

11   Q      Do you typically sign documents without reviewing

12          them?

13   A      If I -- if my attorney tells me what it says, I

14          tend to believe him.

15   Q      Fair enough.  On page three of the letter, which,

16          just flip back one page.  And on the top portion

17          it says, the second sentence, "Mr. Johnson

18          attempted to contact Setpoint on numerous

19          occasions regarding the paperwork, but Setpoint

20          cut off all communications."  Describe for me the

21          numerous occasions that you attempted to contact

22          Setpoint.

23   A      My wife was handling a lot of this, and she

24          tried, on several occasions, to talk to Brandy.

25          And from what I was told, that Brandy didn't have

```
 1            any answers for her and did not respond at some

 2            point.

 3     Q      Didn't have answers or didn't respond?  Two

 4            different things.

 5     A      With two different -- contacted, didn't have any

 6            answers, and then didn't respond further with

 7            another contact.

 8     Q      Before I ask about your wife's conversations, did

 9            you attempt to contact -- you, personally,

10            attempt to contact Setpoint regarding any of the

11            documentation they provided to you?

12     A      No.

13     Q      Were you curious --

14     A      Not that I recall.

15     Q      Were you curious as to why they were providing

16            you the documentation?

17     A      Repeat that question?

18     Q      Were you curious as to why they were providing

19            you the documentation that they were requesting

20            you to fill out -- the FMLA paperwork?

21     A      No.

22     Q      You weren't curious?

23     A      I wasn't curious.

24     Q      Do you know if they were trying to interact with

25            you to determine what it was you were able to do
```

```
 1            at work and not able to do at work?

 2    A      I just didn't -- this was after the termination

 3           and I felt that they just wanted the issue to go

 4           away.

 5    Q      "This," being the EEOC letter was after the

 6           termination?  It's dated July 10th.  I agree with

 7           you.

 8    A      Right.

 9    Q      Is that the "this" you're referring to?

10    A      Right.

11    Q      The delivery of FMLA paperwork to you - at least

12           one time we know from the documents -- was before

13           termination, though, correct?

14    A      That was the paperwork that they wanted the

15           doctor to fill out.

16    Q      Correct.  Before your termination, correct?

17    A      Before my termination.

18    Q      You did not contact Setpoint personally to

19           discuss that paperwork, correct?

20    A      No.

21    Q      You understand your wife may have contacted them?

22    A      My wife did.  What date?  I don't know, but told

23           them that the doctor had refused to do the

24           paperwork because he said I'm not disabled.

25    Q      Do you know if in February of 2014 your wife
```

MICHAEL JOHNSON                                    5/18/2017

```
 1   A     Do I agree with that statement?  Is that your
 2         question?
 3   Q     That's my first question.  Do you agree with that
 4         statement?
 5   A     I do.
 6   Q     How do you know if Setpoint perceived that you
 7         had a disability?
 8   A     Well, obviously, they had to perceive that I had
 9         a short-term disability based on the information
10         that they had from the doctor, one would think.
11   Q     Your opinion is that they perceived you had a
12         short-term disability based on the opinion from
13         the doctor?
14   A     Right.
15   Q     Has anyone at Setpoint told you, "Mr. Johnson, we
16         perceive that you're disabled"?
17   A     The only information I got was upon getting
18         terminated, was that, "You not being able to
19         drive is a condition for employment.  You have to
20         drive."  I explained to David Ross that I had
21         made provisions in this short time to have
22         transportation for wherever I needed to go.  And
23         he says, "That's not acceptable.  It's a
24         condition of your employment.  Give Rachel your
25         computer and your gas card.  Go home."
```

**MICHAEL JOHNSON**                          5/18/2017

```
 1   Q      If you couldn't drive for six months, you didn't
 2          need the gas card, correct?
 3   A      Well, I needed a gas card to fuel my vehicle so I
 4          could get to wherever I was going.
 5   Q      If you were driving, correct?
 6   A      Well, either I was driving or whoever I had
 7          driving me, it was still my vehicle and needed to
 8          be gassed up to get there.
 9   Q      Okay.  Discrimination against you because of an
10          actual disability.  Did you -- do you -- I'm
11          sorry.  Bad question.  Did you have an actual
12          disability in --
13   A      In that short period of time, yes.  Could I add
14          to that?
15   Q      Sure.
16   A      The disability pertains to not being able to
17          physically drive at that time, not doing my job.
18   Q      "Failure to provide Mr. Johnson with a reasonable
19          accommodation."  We've discussed your lack of
20          request to Setpoint of a reasonable
21          accommodation.  You did advise me just now that
22          you discussed with Mr. Ross your brother-in-law
23          driving for you for a short period of time; is
24          that correct?
25   A      Yes.
```

MICHAEL JOHNSON                                    5/18/2017

1   Q   And he told you no, the condition of your

2       employment is that you drive.  Is that --

3   A   Davis Ross told me that.

4   Q   Davis Ross told you that?

5   A   Yeah.

6   Q   And up until the time of you going out for your

7       brain surgery, you, indeed, did drive during your

8       employment?

9   A   Sure.

10  Q   Part of your employment was to drive to sell

11      products, to visit manufacturers, et cetera?

12  A   To perform my job function.

13  Q   You had to drive?

14  A   Yeah.

15  Q   Here we have -- the next one is "Retaliation

16      against Mr. Johnson due to his disability and due

17      to his attempted exercise of rights under the

18      ADA."  The question I have for you on this one

19      is, "due to his disability," those are not your

20      words, correct?

21  A   That's the wording of the document --

22  Q   Yes.

23  A   -- by my attorney.

24  Q   My question to you, and I think I asked this

25      earlier this morning, you did not perceive

MICHAEL JOHNSON                              5/18/2017

Page 103

```
 1          yourself as disabled?

 2    A     That's correct.

 3    Q     And you never have perceived yourself as

 4          disabled?

 5    A     That's correct.

 6    Q     We can move from that document, Mr. Johnson.

 7          We're going to -- I don't think I'll come back to

 8          it, but, who knows.  Do you allege that any

 9          specific person discriminated against you or is

10          your claim that Setpoint, as a company,

11          discriminated against you?

12    A     I don't know who made the decision to terminate

13          me.

14    Q     Following your termination, did Joey Jobe call

15          you --

16    A     No.

17    Q     -- or Bill Kiteley call you?

18    A     Neither.

19    Q     Or Mr. Ross?

20    A     No.  Not after my termination.

21    Q     Brandy Piazza?

22    A     No.

23    Q     Or --

24    A     Brandy?

25    Q     Brandy.
```

MICHAEL JOHNSON                                    5/18/2017

```
 1              and say, "It's been six months.  I'm fine to

 2              drive.  Send me back to work"?

 3    A         No.

 4    Q         Did you contact anybody at Setpoint about

 5              reemployment at any time?

 6    A         No.

 7    Q         Do you have a reason that you did not?

 8    A         Well, they terminated me.  So if they wanted to

 9              keep me, they would have -- wouldn't have

10              terminated me.

11    Q         Oftentimes when people are terminated, they may

12              seek reemployment.  Sometimes they may not seek

13              reemployment.  Were you told by anyone at

14              Setpoint that you may not seek reemployment?

15    A         I wasn't told by anybody that I should go back

16              and ask for reemployment.

17    Q         And vice versa, you were not told that you --

18    A         Right.

19    Q         -- should not, correct?  You are not aware of any

20              prohibition of reemployment for you at Setpoint,

21              correct?

22    A         Correct.

23    Q         Did anyone at Setpoint make any statements to you

24              that would support your claim that you were

25              discriminated against because of a disability or
```

MICHAEL JOHNSON                                    5/18/2017

Page 106

```
 1          a perceived disability?

 2    A     No.

 3    Q     Have you or has anyone on your behalf taken any

 4          statements in this case?

 5    A     No.

 6    Q     Are you aware of any documentation or documents

 7          that suggest you were discriminated against?

 8    A     No, other than the information supplied by --

 9          either verbal or written by my attorney.

10    Q     Other than documents provided to you by your

11          attorney, you're not aware of any other documents

12          that suggest that someone perceived you as

13          disabled or fired you because of a disability?

14    A     Not from Setpoint.  No.

15    Q     Have you ever alleged any type of discrimination,

16          whether it be disability, race, sex, age,

17          national origin, in your life before?

18    A     No.

19    Q     Have you ever filed a lawsuit before?

20    A     No.

21    Q     Have you ever been party to a lawsuit before?

22    A     No, not that I recall.

23    Q     Do you believe that you were treated less

24          favorably --

25    A     Oh, wait.  Let me rephrase that.
```

1                  sheriff's office and then to us.  So that's --

2                  but actually getting paid for duties with the

3                  sheriff's office, no.

4        Q         How much income did you receive in 2016 from

5                  being activated as a reserve deputy?

6        A         A thousand dollars ($1,000.00).

7        Q         A thousand dollars ($1,000.00).  How about in

8                  2015?

9        A         Probably about the same amount.

10       Q         Do you know if any of that money was reported to

11                 Dr. Boudreaux when he was doing his economist

12                 report?

13       A         I don't know.

14       Q         Do you believe you were treated less favorably

15                 than other employees that had driving

16                 restrictions at Setpoint?

17       A         I don't know of anybody that had driving

18                 restrictions.

19       Q         Are you aware of Setpoint's policy against

20                 discrimination and harassment?

21       A         I think we were given documentation on that as a

22                 matter of protocol.

23       Q         Part of the employee policy manual --

24       A         Yes.

25       Q         -- and handbook?

MICHAEL JOHNSON                                   5/18/2017

1  A     Yes.

2  Q     You don't deny receiving that, correct?

3  A     No, I don't.

4  Q     And do you know or do you remember if that

5        document pertained to how to report

6        discrimination?

7  A     I assume it did, sexual harassment, things of

8        that nature.

9  Q     Do you know if included a provision regarding

10       disability discrimination?

11 A     I don't recall.

12 Q     Did you report to anyone at Setpoint that you

13       felt you were being discriminated against because

14       of a perceived or actual disability?

15 A     No.

16 Q     We discussed the list of damages that your

17       economist provided and that your counsel provided

18       through discovery responses, in general terms,

19       before.  And I asked you some questions about if

20       you sought treatment by a psychiatrist or a

21       psychologist.  Do you recall that line of

22       questioning?

23 A     Yes.

24 Q     I just want to close the loop on that just a

25       little bit before I move on.  Are you claiming

MICHAEL JOHNSON                                     5/18/2017

Page 117

```
 1          Energy?
 2    A     I get up early, you know, contact with
 3          manufacturers that we hope to bring onboard.
 4          This is very new, and so we just started making
 5          contact with potential customers, bringing some
 6          guys onboard that can help us with the products
 7          we have.  And that's an all day, half the night
 8          deal.
 9    Q     Are you excited about this prospect?
10    A     I am excited about it.
11    Q     It sounds like you're energetic about it, too.
12          Is it something you get up and do, and do it
13          till --
14    A     Yeah.
15    Q     Yeah?  Would you agree with that?
16    A     Oh, yeah, very much.
17    Q     How were you compensated by Setpoint?
18    A     Salary, plus the incentive.
19    Q     What was your last salary with Setpoint?
20    A     I think my last W-2 was around a hundred and
21          thirty-five thousand ($135,000.00), a hundred and
22          thirty-nine ($139,000.00), something like that.
23    Q     And what is the -- that includes salary plus
24          incentive or is that the one --
25    A     Salary plus incentive.
```

MICHAEL JOHNSON                                    5/18/2017

1    Q    What was your base salary?

2    A    A hundred ($100,00.00).  Right at a hundred

3         ($100,000.00).

4    Q    And what were the incentives?

5    A    I wasn't quite clear on how they come to the

6         number.  But it was -- I'm told that it was based

7         on profit of the products that I was product

8         manager over.

9    Q    Was it like the deal with J.H. Carter, where you

10        were told a percentage of the profit margins?

11   A    We didn't get to that.  But we gave -- we

12        discussed examples and that type of thing.

13   Q    Did you receive any unemployment insurance

14        benefits?

15   A    I did.

16   Q    For how long?

17   A    I would say four months.

18   Q    Until you started working with RES?

19   A    After RES.

20   Q    Oh, I'm sorry.  Bad question.  After your

21        employment with Setpoint, did you receive any

22        unemployment benefits?

23   A    I don't recall.

24   Q    Do you recall if you applied for unemployment

25        benefits?

# DMC *Critic Chambers*

## Auto Allowance Policy

Employee Name (print): _MICHAEL L. JOHNSON_

Location: _LAFAYETTE_

An Auto Allowance of $800 per month and a Corporate gas card will be provided to Account Managers, Product Managers, Regional Sales Managers, Director of Sales & Operations and General Managers. For any position outside of those listed, approval is required by VP of HR and the appropriate Executive Manager. The following rules and guidelines apply:

- Auto allowance is paid in conjunction with a pay period. No allowance is provided for partial pay periods (i.e., no pro-rations permitted).
- Auto allowance is paid in the amount of $400 for two pay periods per month. In those months where there are more than two pay periods paid out, auto allowance will not be paid on the third pay period.
- Employee vehicle should have four doors and seat at least three customers comfortably.
- Vehicle must be maintained in good condition projecting an image of professionalism. Employee may not display political or offensive stickers or magnets on the automobile.
- Employees are encouraged to purchase a vehicle that achieves at least 16 mpg in city driving and at least 22 mpg highway.
- Corporate gas cards are ONLY for the purchase of gas. No purchases of food, drink, car wash, tires, oil changes or any other non-gas purchases are permitted.
- When using the Corporate gas card, only Regular (non-premium) gas / diesel may be purchased.
- It is strictly prohibited to use the Corporate gas card to fill any automobile other than the vehicle listed below. Any change in vehicle should be reported to HR. Using the gas card for any other vehicle other than the one listed below can result in payroll deduction for that amount. Gas card may never be used to fill a boat, four-wheeler, mobile home or other non-automobiles.
- When going on vacation or taking personal trips, employee should use good judgment in using a personal credit card to purchase gas for these excursions.
- The company will conduct period mileage audits to ensure accuracy of reported mileage.

The following information regarding your automobile is required in order to participate:

Make (Example: Ford, Chevy): _FORD_

Year: _2009_          Model (Example: Taurus, F150): _F150_

Odometer Mileage: _100,000_          License Plate #: _X43_

I have received a copy of this policy and agree to abide it. I understand this program may change at any time, and understand that failure to use good judgment in participating in this program may result in removal from the program in addition to disciplinary action up to and including termination of employment.

Employee Signature: _[signature]_          Date: _12-19-11_

Manager Signature: _Stephanie Flory_          Date: _12/19/11_

**EXHIBIT 2**

E-MAILED DEC 1 9 2011

SP 000013

## DMC-CARTER CHAMBERS
### Invoice Transaction Report

DMC-CARTER CHAMBERS
Michael Johnson
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040                          **Closing Date:** 07/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 06-02 13:00 | EM | 412 W MARTIN LUTHER KING GRAND COTEAU, LA | 00022710 | 8 | UNLD | 20.28 | 68.15 | .00 |
| | 06-30 10:36 | CH | 104 E GLORIA SWITCH ROAD LAFAYETTE, LA | 1962586 | 8 | UNLD | 16.01 | 53.16 | .00 |

DMC-CARTER CHAMBERS CARTER CHAMBERS
190-0001-63600

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total for Card: 500225 | | | | | | | 36.29 | 121.31 | .00 |
| | | | Total for Statement: | | | | 36.29 | 121.31 | .00 |

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

## DMC-CARTER CHAMBERS
### Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040                          **Closing Date:** 06/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 05-01 17:57 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00260983 | 8 | UNLD | 20.49 | 66.17 | .00 |


**EXHIBIT 3**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 05-06 14:57 | CK | 3400 PINHOOK RD LAFAYETTE, LA | 872509 | 8 | UNLD | 19.54 | 62.31 | .00 |
| 05-07 17:52 | CG | 7050 SOUTHWEST FREEWAY HOUSTON, TX | 175212 | 8 | UNLD | 19.23 | 65.36 | .00 |
| 05-09 17:00 | CH | 15125 HIGHWAY 395 ROANOKE, LA | 5275828 | 8 | UNLD | 17.10 | 56.42 | .00 |
| 05-13 11:53 | RT | 5100 AMBASSADOR CAFFREY P LAFAYETTE, LA | 00017132 | 8 | UNLD | 18.54 | 59.70 | .00 |
| 05-16 14:12 | SH | 3332 W PINHOOK & BONIN LAFAYETTE, LA | 0196840 | 8 | UNLD | 7.13 | 23.53 | .00 |
| 05-17 16:29 | SH | 3332 W PINHOOK & BONIN LAFAYETTE, LA | 0203885 | 8 | UNLD | 17.82 | 58.80 | .00 |
| 05-21 16:51 | CK | 3400 PINHOOK RD LAFAYETTE, LA | 659902 | 8 | UNLD | 19.19 | 61.77 | .00 |
| 05-22 15:30 | SH | 7100 GARTH RD BAYTOWN, TX | 0244103 | 8 | UNLD | 15.55 | 52.86 | .00 |
| 05-23 10:34 | PH | 13000 MC ARTHUR MANSFIELD, TX | 103456 | 8 | UNLD | 22.86 | 77.71 | .00 |
| 05-25 10:51 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00254915 | 8 | UNLD | 20.06 | 66.21 | .00 |
| 05-29 17:01 | SH | 3332 W PINHOOK & BONIN LAFAYETTE, LA | 0262832 | 8 | UNLD | 20.22 | 66.73 | .00 |
| 05-31 15:45 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00316752 | 8 | UNLD | 14.24 | 47.01 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
**190-0001-63600**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total for Card: 500225** | | | | | | 231.97 | 764.58 | .00 |
| **Total for Statement:** | | | | | | 231.97 | 764.58 | .00 |

---

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

---

## DMC-CARTER CHAMBERS
## Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040          **Closing Date:** 05/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 04-02 10:05 | VL | 8110 S FM 565 RD BAYTOWN, TX | 00594614 | 8 | UNLD | 21.41 | 79.21 | .00 |
| | 04-04 20:02 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00258028 | 8 | UNLD | 21.60 | 74.30 | .00 |
| | 04-08 16:36 | CK | 3400 PINHOOK RD LAFAYETTE, LA | 475247 | 8 | UNLD | 19.93 | 65.56 | .00 |

SP 000088

| | 04-10 12:36 | SH | 12340 W AIRPORT MEADOW, TX | 0229922 | 8 | UNLD | 21.73 | 74.76 | .00 |
| | 04-12 22:04 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00312661 | 8 | UNLD | 21.57 | 72.03 | .00 |
| | 04-17 08:51 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00261774 | 8 | UNLD | 19.17 | 63.26 | .00 |
| | 04-22 08:31 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00251416 | 8 | UNLD | 21.44 | 69.90 | .00 |
| | 04-24 14:24 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00244005 | 8 | UNLD | 12.74 | 41.14 | .00 |
| | 04-26 16:44 | SH | 3875 INTERSTATE 10 S BEAUMONT, TX | 0096628 | 8 | UNLD | 18.08 | 64.35 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
**190-0001-63600**

| **Total for Card: 500225** | | | | | | | **177.67** | **604.51** | **.00** |
| | | **Total for Statement:** | | | | | **177.67** | **604.51** | **.00** |

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

**DMC-CARTER CHAMBERS**
**Invoice Transaction Report**

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040          **Closing Date:** 04/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 03-01 07:41 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00300667 | 8 | UNLD | 19.94 | 72.99 | .00 |
| | 03-05 07:51 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00242474 | 8 | UNLD | 22.64 | 81.48 | .00 |
| | 03-08 16:24 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00308054 | 8 | UNLD | 18.28 | 65.06 | .00 |
| | 03-09 19:04 | RT | 1975 SW RAILROAD AVENUE HAMMOND, LA | 00005015 | 1 | UNLD | 20.23 | 70.00 | .00 |
| | 03-13 08:14 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00267658 | 8 | UNLD | 20.15 | 71.31 | .00 |
| | 03-17 08:56 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00231090 | 8 | UNLD | 19.86 | 69.89 | .00 |
| | 03-18 10:02 | CO | 10403 INTERSTATE 10 HWY BAYTOWN, TX | 100215 | 8 | UNLD | 14.86 | 53.47 | .00 |
| | 03-19 07:46 | VL | 17250 S IH 35 DILLEY, TX | 00232856 | 8 | UNLD | 17.90 | 63.73 | .00 |
| | 03-19 18:47 | VL | 1318 2ND STREET PLEASANTON, TX | 00058303 | 8 | UNLD | 16.96 | 58.84 | .00 |

| | 03-20 20:32 | LV | 2024A WEST ST. VINTON, LA | 6295 | 8 | UNLD | 21.01 | 74.77 | .00 |
| | 03-24 14:51 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00206309 | 8 | UNLD | 21.55 | 75.43 | .00 |
| | 03-29 10:20 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00293199 | 8 | UNLD | 20.47 | 69.99 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
**190-0001-63600**
**Total for Card: 500225**          233.85    826.96    .00

         **Total for Statement:**        233.85    826.96    .00

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

## DMC-CARTER CHAMBERS
## Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040          **Closing Date:** 03/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 02-01 07:38 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00293062 | 8 | UNLD | 18.52 | 62.22 | .00 |
| | 02-01 18:08 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00293001 | 8 | UNLD | 17.66 | 59.32 | .00 |
| | 02-04 15:26 | LV | 2024A WEST ST. VINTON, LA | 695 | 8 | UNLD | 17.87 | 60.74 | .00 |
| | 02-07 09:24 | CH | 15125 HIGHWAY 395 ROANOKE, LA | 5230258 | 8 | UNLD | 17.75 | 59.62 | .00 |
| | 02-09 10:49 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00226471 | 8 | UNLD | 17.39 | 59.46 | .00 |
| | 02-12 07:44 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00226538 | 8 | UNLD | 12.77 | 43.68 | .00 |
| | 02-14 10:35 | CH | 10414 RICHMOND AVE HOUSTON, TX | 5119785 | 8 | UNLD | 19.59 | 68.55 | .00 |
| | 02-15 15:54 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00292705 | 8 | UNLD | 16.42 | 58.46 | .00 |
| | 02-21 08:50 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00247223 | 8 | UNLD | 22.46 | 82.66 | .00 |
| | 02-26 08:09 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00242996 | 8 | UNLD | 21.76 | 79.63 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
**190-0001-63600**
**Total for Card: 500225**          182.19    634.34    .00

|  |  |  |  |  |  | 182.19 | 634.34 | .00 |
|---|---|---|---|---|---|---|---|---|

Total for Statement:

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

# DMC-CARTER CHAMBERS
## Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040          **Closing Date:** 02/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 01-02 08:03 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00234572 | 8 | UNLD | 19.82 | 62.64 | .00 |
| | 01-04 13:40 | VL | 8110 S FM 565 RD BAYTOWN, TX | 00534648 | 8 | UNLD | 23.18 | 78.81 | .00 |
| | 01-07 08:05 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00235289 | 8 | UNLD | 21.41 | 68.08 | .00 |
| | 01-11 08:05 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00274767 | 8 | UNLD | 13.52 | 43.27 | .00 |
| | 01-14 09:29 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00234593 | 8 | UNLD | 12.33 | 39.46 | .00 |
| | 01-14 13:08 | CH | 4390 NW SAM HOUSTON PKWY HOUSTON, TX | 0912626 | 8 | UNLD | 21.35 | 70.44 | .00 |
| | 01-16 18:34 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00233155 | 8 | UNLD | 19.68 | 62.97 | .00 |
| | 01-19 09:24 | VL | 8110 S FM 565 RD BAYTOWN, TX | 00543470 | 8 | UNLD | 20.30 | 67.00 | .00 |
| | 01-21 08:39 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00231057 | 8 | UNLD | 22.26 | 71.24 | .00 |
| | 01-21 18:34 | SH | 114 JASMINE RD EGAN, LA | 0525428 | 8 | UNLD | 22.32 | 70.29 | .00 |
| | 01-24 08:54 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00251238 | 8 | UNLD | 16.40 | 52.49 | .00 |
| | 01-25 11:56 | GU | 4590 HWY 10 WINNIE, TX | 00042664 | 8 | UNLD | 19.48 | 63.49 | .00 |
| | 01-26 14:11 | CH | 15125 HIGHWAY 395 ROANOKE, LA | 5224880 | 8 | UNLD | 17.02 | 54.47 | .00 |
| | 01-28 20:45 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00233122 | 8 | UNLD | 11.68 | 37.39 | .00 |

DMC-CARTER CHAMBERS CARTER CHAMBERS
190-0001-63600

| | | | | | | | 260.75 | 842.04 | .00 |
|---|---|---|---|---|---|---|---|---|---|
| Total for Card: 500225 | | | | | | | 260.75 | 842.04 | .00 |
| | | Total for Statement: | | | | | 260.75 | 842.04 | .00 |

SP 000091

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

**DMC-CARTER CHAMBERS**
**Invoice Transaction Report**

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040              **Closing Date:** 01/01/2013

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 12-04 08:34 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00235980 | 8 | UNLD | 21.90 | 69.19 | .00 |
| | 12-06 09:24 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00257564 | 8 | UNLD | 12.34 | 39.00 | .00 |
| | 12-09 10:34 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00194463 | 8 | UNLD | 17.10 | 53.70 | .00 |
| | 12-14 11:13 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00289928 | 8 | UNLD | 21.69 | 66.81 | .00 |
| | 12-18 09:46 | SH | 1044 CHURCHPOINT HWY RAYNE, LA | 0183566 | 8 | UNLD | 17.87 | 55.39 | .00 |
| | 12-19 14:56 | CH | 10104 LAPORTE HWY HOUSTON, TX | 6949240 | 8 | UNLD | 19.54 | 58.60 | .00 |
| | 12-21 16:03 | EM | 3555 NORTH UNIVERSITY LAFAYETTE, LA | 00248595 | 8 | UNLD | 23.83 | 73.39 | .00 |
| | 12-28 07:44 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00251760 | 8 | UNLD | 18.05 | 57.03 | .00 |

DMC-CARTER CHAMBERS CARTER CHAMBERS
190-0001-63600

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total for Card: 500225 | | | | | | | 152.32 | 473.11 | .00 |
| | | | Total for Statement: | | | | 152.32 | 473.11 | .00 |

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

**DMC-CARTER CHAMBERS**
**Invoice Transaction Report**

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040              **Closing Date:** 12/01/2012

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 11-06 06:53 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00251742 | 8 | UNLD | 23.05 | 76.07 | .00 |
| | 11-11 12:09 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00204408 | 8 | UNLD | 20.42 | 66.16 | .00 |
| | 11-11 17:05 | PH | 365 HWY 123 STOCKDALE, TX | 170525 | 8 | UNLD | 23.28 | 74.70 | .00 |
| | 11-12 18:18 | MR | 2145 W. OAKLAWN PLEASANTON, TX | 00259400 | 8 | UNLD | 15.43 | 49.69 | .00 |
| | 11-14 11:22 | VL | 14 N KESSLER AVE SCHULENBURG, TX | 00247336 | 8 | UNLD | 21.68 | 70.66 | .00 |
| | 11-15 07:38 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00269761 | 8 | UNLD | 17.12 | 55.11 | .00 |
| | 11-16 12:56 | EM | 690 N MAIN ST VIDOR, TX | 00141769 | 8 | UNLD | 21.97 | 65.89 | .00 |
| | 11-19 18:02 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00253319 | 8 | UNLD | 23.22 | 74.28 | .00 |
| | 11-25 14:11 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00237390 | 8 | UNLD | 19.20 | 61.43 | .00 |
| | 11-30 13:11 | MR | 2420 W. PINHOOK ROAD LAFAYETTE, LA | 00347256 | 8 | UNLD | 21.70 | 68.58 | .00 |

DMC-CARTER CHAMBERS CARTER CHAMBERS
190-0001-63600
Total for Card: 500225                                                          207.07     662.57     .00
                          Total for Statement:                                  207.07     662.57     .00

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

**DMC-CARTER CHAMBERS**
**Invoice Transaction Report**

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040              **Closing Date:** 11/01/2012

SP 000093

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 10-02 18:29 | TA | I-10 & THOMPSON ROAD, EXI BAYTOWN, TX | 00187448 | 8 | UNLD | 22.64 | 78.33 | .00 |
| | 10-08 09:06 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00254465 | 8 | UNLD | 17.15 | 60.89 | .00 |
| | 10-09 15:47 | CH | 5354 UNIVERSITY DRIVE NATCHITOCHES, LA | 6358477 | 8 | UNLD | 23.71 | 86.52 | .00 |
| | 10-10 16:31 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00265879 | 8 | UNLD | 14.86 | 52.30 | .00 |
| | 10-11 16:17 | SH | 1919 EVANGELINE RD JENNINGS, LA | 0424226 | 8 | UNLD | 20.58 | 75.33 | .00 |
| | 10-16 10:00 | SH | 3332 W PINHOOK & BONIN LAFAYETTE, LA | 0636506 | 8 | UNLD | 22.04 | 78.88 | .00 |
| | 10-19 08:24 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00320878 | 8 | UNLD | 14.75 | 52.22 | .00 |
| | 10-21 14:23 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00228711 | 8 | UNLD | 13.31 | 47.12 | .00 |
| | 10-22 11:59 | LV | 190 US HIGHWAY 90 LULING, TX | 450 | 8 | UNLD | 21.38 | 71.83 | .00 |
| | 10-24 08:40 | SH | 709 NORTH LA GRANGE ST FLATONIA, TX | 0732438 | 8 | UNLD | 20.18 | 71.83 | .00 |
| | 10-25 07:45 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00284963 | 8 | UNLD | 19.77 | 68.81 | .00 |
| | 10-28 08:45 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00214935 | 8 | UNLD | 20.37 | 69.24 | .00 |
| | 10-31 15:03 | MR | 2420 W. PINHOOK ROAD LAFAYETTE, LA | 00325418 | 8 | UNLD | 17.44 | 57.89 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
190-0001-63600

| Total for Card: 500225 | | | | | | | 248.18 | 871.19 | .00 |
|---|---|---|---|---|---|---|---|---|---|
| | Total for Statement: | | | | | | 248.18 | 871.19 | .00 |

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

**DMC-CARTER CHAMBERS**
**Invoice Transaction Report**

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040          **Closing Date:** 10/01/2012

SP 000094

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 09-04 08:08 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00262466 | 8 | UNLD | 20.94 | 76.23 | .00 |
| | 09-08 10:14 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00254924 | 8 | UNLD | 20.28 | 74.22 | .00 |
| | 09-11 06:58 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00261063 | 8 | UNLD | 17.58 | 64.34 | .00 |
| | 09-11 12:30 | VL | 969 E IH 10 SEGUIN, TX | 00035308 | 8 | UNLD | 18.85 | 71.63 | .00 |
| | 09-13 15:03 | VL | 13955 IH 37 S ELMENDORF, TX | 00463525 | 8 | UNLD | 22.54 | 85.19 | .00 |
| | 09-13 19:55 | LV | 2024A WEST ST. VINTON, LA | 7987 | 8 | UNLD | 18.43 | 68.16 | .00 |
| | 09-18 18:00 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00254072 | 8 | UNLD | 21.40 | 77.87 | .00 |
| | 09-22 09:18 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00263442 | 8 | UNLD | 16.35 | 59.18 | .00 |
| | 09-27 13:28 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00285393 | 8 | UNLD | 21.36 | 76.04 | .00 |
| | 09-30 13:57 | LV | 2024A WEST ST. VINTON, LA | 9511 | 8 | UNLD | 22.05 | 76.27 | .00 |
| | 09-30 19:55 | PI | 1815 NORTH FOSTER RD SAN ANTONIO, TX | 1410 | 8 | UNLD | 17.72 | 61.30 | .00 |

DMC-CARTER CHAMBERS CARTER CHAMBERS

190-0001-63600

Total for Card: 500225

| | | | | | | | 217.50 | 790.43 | .00 |
|---|---|---|---|---|---|---|---|---|---|
| Total for Statement: | | | | | | | 217.50 | 790.43 | .00 |

Message Codes  1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

## DMC-CARTER CHAMBERS
## Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630

**ACCOUNT NUMBER:** 869204040                    **Closing Date:** 09/01/2012

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 08-03 13:56 | IN | 2051 HWY 90 BERWICK, LA | 00047379 | 1 | UNL+ | 21.68 | 75.00 | .00 |
| | 08-06 13:39 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00268819 | 8 | UNLD | 18.60 | 63.24 | .00 |

SP 000095

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 08-10 07:33 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00320184 | 8 | UNLD | 22.84 | 79.93 | .00 |
| 08-12 14:07 | SH | 3890 I 10 SOUTH BEAUMONT, TX | 0105320 | 8 | UNLD | 19.12 | 75.33 | .00 |
| 08-14 07:07 | VL | 3603 S E MILITARY DR SAN ANTONIO, TX | 00191713 | 8 | UNLD | 20.96 | 72.50 | .00 |
| 08-15 16:58 | LV | 2024A WEST ST. VINTON, LA | 6136 | 1 | UNLD | 23.73 | 82.08 | .00 |
| 08-18 16:25 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00253067 | 8 | UNLD | 20.25 | 70.46 | .00 |
| 08-23 06:32 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00285226 | 8 | UNLD | 17.86 | 62.52 | .00 |
| 08-24 07:10 | SH | 13250 FM 1960 WEST HOUSTON, TX | 0738724 | 8 | UNLD | 15.70 | 54.48 | .00 |
| 08-26 14:14 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00252950 | 8 | UNLD | 21.44 | 77.17 | .00 |
| 08-28 15:35 | CH | 104 E GLORIA SWITCH ROAD LAFAYETTE, LA | 1901060 | 8 | UNLD | 13.00 | 50.56 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
**190-0001-63600**
**Total for Card: 500225**                                                          215.18    763.27      .00

                                     Total for Statement:                           215.18    763.27      .00

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

## DMC-CARTER CHAMBERS
### Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE,LA 708796630
    **ACCOUNT NUMBER:** 869204040                          **Closing Date:** 08/01/2012

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 07-02 08:27 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00262603 | 8 | UNLD | 19.76 | 60.05 | .00 |
| | 07-08 12:25 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00229185 | 8 | UNLD | 21.41 | 65.92 | .00 |
| | 07-10 20:57 | CH | 120 E PONT DES MOUTON LAFAYETTE, LA | 1528980 | 8 | UNLD | 17.59 | 53.83 | .00 |
| | 07-13 07:36 | VL | 100 BENTON SPUR BOSSIER CITY, LA | 0007841 | 8 | UNLD | 24.65 | 76.41 | .00 |
| | 07-15 11:31 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00221130 | 8 | UNLD | 18.62 | 58.82 | .00 |
| | 07-22 10:57 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00232839 | 8 | UNLD | 21.75 | 71.32 | .00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 07-27 16:42 | NO | 1407 SE EVANGELINE TRWY LAFAYETTE, LA | 00006806 | 8 | SUPR | 21.25 | 69.27 | .00 |
| 07-30 12:25 | MR | 2420 W. PINHOOK ROAD LAFAYETTE, LA | 00245643 | 8 | UNLD | 16.53 | 54.21 | .00 |
| 07-31 16:40 | CH | 6100 W CALHOUN DR ALEXANDRIA, LA | 5662181 | 8 | UNLD | 23.64 | 79.43 | .00 |

DMC-CARTER CHAMBERS CARTER CHAMBERS
190-0001-63600

| | | |
|---|---|---|
| Total for Card: 500225 | 185.20 | 589.26 | .00 |
| Total for Statement: | 185.20 | 589.26 | .00 |

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

## DMC-CARTER CHAMBERS
### Invoice Transaction Report

DMC-CARTER CHAMBERS
ATTN MARY WILDER
PO BOX 86630
BATON ROUGE, LA 708796630

**ACCOUNT NUMBER:** 869204040                     **Closing Date:** 07/01/2012

| Card Number | Transaction Date / Time | Ven ID | Transaction Location / Description | Invoice Number | Msg CD | Prod CD | Quantity | Transaction Amount | Exempted Taxes |
|---|---|---|---|---|---|---|---|---|---|
| 500225 | 06-02 12:00 | EM | 3555 NORTH UNIVERSITY LAFAYETTE, LA | 00227716 | 8 | UNLD | 20.62 | 69.29 | .00 |
| | 06-05 08:31 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00266881 | 8 | UNLD | 21.27 | 71.87 | .00 |
| | 06-09 10:02 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00261469 | 8 | UNLD | 18.46 | 62.39 | .00 |
| | 06-12 20:55 | PI | 2111 SW RAILROAD AVENUE HAMMOND, LA | 8149 | 8 | UNLD | 19.92 | 63.13 | .00 |
| | 06-14 09:50 | VI | 5109 UNIVERSITY PKWY NATCHITOCHES, LA | 00000027 | 8 | UNLD | 19.15 | 61.65 | .00 |
| | 06-16 09:08 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00268038 | 8 | UNLD | 19.17 | 62.10 | .00 |
| | 06-19 09:43 | EM | 14958 FM 1663 WINNIE, TX | 00105332 | 8 | UNLD | 18.18 | 61.81 | .00 |
| | 06-20 09:28 | VL | 1318 2ND STREET PLEASANTON, TX | 00132993 | 8 | UNLD | 22.14 | 72.40 | .00 |
| | 06-21 17:20 | VL | 2130 STATE HWY 80 LULING, TX | 00006734 | 8 | UNLD | 19.83 | 67.42 | .00 |
| | 06-22 10:16 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00319385 | 8 | UNLD | 19.22 | 61.51 | .00 |
| | 06-25 08:30 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00265906 | 8 | UNLD | 20.40 | 65.28 | .00 |

| 06-29 07:34 | EM | 129 FRONTAGE ROAD RAYNE, LA | 00331370 | 8 | UNLD | 17.99 | 56.13 | .00 |

**DMC-CARTER CHAMBERS CARTER CHAMBERS**
**190-0001-63600**

| **Total for Card: 500225** | | | | | | **236.35** | **774.98** | **.00** |
| | | **Total for Statement:** | | | | **236.35** | **774.98** | **.00** |

Message Codes: 1 - Electronic Sale with Authorization 2 - Keyed Sale with Authorization 4 - Electronic Sale without Authorization
5 - Keyed Sale without Authorization 8 - Electronic Sale at Pump 9 - Manual Sale

SP 000098

DMC-CARTER CHAMBERS
Fuel Cart Transaction Report from July 24, 2013 to December 30, 2013

| Account Code | Customer ID | Transaction Number | Transaction Date | Merchant Name | Merchant City | Merchant State | Vehicle Number | Card Number | Employee Number | Vehicle Description | Odometer | Miles Driven | Product Description | Unit/ Gallons | Gross Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RJ913 | BGFNL | 000443825 | 07/24/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 162,662.00 | 0 | UNL REG 86/87 OC | 21.18 | $72.82 |
| RJ913 | BGFNL | 000316414 | 07/29/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 162,924.00 | 262 | UNL REG 86/87 OC | 17.02 | $58.54 |
| RJ913 | BGFNL | 000152537 | 07/31/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 163,200.00 | 276 | UNL REG 86/87 OC | 18.16 | $62.10 |
| RJ913 | BGFNL | 000431404 | 08/06/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 163,577.00 | 377 | UNL REG 86/87 OC | 23.33 | $80.00 |
| RJ913 | BGFNL | 000404426 | 08/09/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 163,931.00 | 354 | UNL REG 86/87 OC | 23.26 | $79.77 |
| RJ913 | BGFNL | 000477042 | 08/15/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 164,312.00 | 381 | UNL REG 86/87 OC | 22.36 | $76.02 |
| RJ913 | BGFNL | 000323115 | 08/19/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 164,643.00 | 331 | UNL REG 86/87 OC | 20.35 | $69.18 |
| RJ913 | BGFNL | 000424091 | 08/23/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 164,921.00 | 278 | UNL REG 86/87 OC | 17.56 | $59.68 |
| RJ913 | BGFNL | 000606208 | 08/29/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 165,284.00 | 363 | UNL REG 86/87 OC | 22.15 | $75.29 |
| RJ913 | BGFNL | 000408697 | 09/03/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 165,753.00 | 469 | UNL REG 86/87 OC | 18.77 | $63.80 |
| RJ913 | BGFNL | 000537639 | 09/04/2013 | EXXONMOBIL 42350819 | BREAUX BRIDGE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 165,975.00 | 222 | UNL REG 86/87 OC | 22.87 | $78.65 |
| RJ913 | BGFNL | 000421904 | 09/09/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 166,353.00 | 378 | UNL REG 86/87 OC | 18.58 | $63.15 |
| RJ913 | BGFNL | 000256152 | 09/14/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 166,586.00 | 233 | UNL REG 86/87 OC | 21.44 | $72.01 |
| RJ913 | BGFNL | 000503485 | 09/18/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 166,854.00 | 268 | UNL REG 86/87 OC | 18.57 | $62.01 |
| RJ913 | BGFNL | 000122507 | 09/19/2013 | SHELL OIL 57544400104 | IOWA | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 167,236.00 | 382 | UNL SUP- 92-94OC | 22.16 | $73.13 |
| RJ913 | BGFNL | 000478344 | 09/24/2013 | EXXONMOBIL 47905310 | RAYNE | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 167,577.00 | 341 | UNL REG 86/87 OC | 20.72 | $67.94 |

**EXHIBIT 4**

DMC-CARTER CHAMBERS
Fuel Cart Transaction Report from July 24, 2013 to December 30, 2013

| Account Code | Customer ID | Transaction Number | Transaction Date | Merchant Name | Merchant City | Merchant State | Vehicle Number | Card Number | Employee Number | Vehicle Description | Odometer | Miles Driven | Product Description | Unit/ Gallons | Gross Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RJ913 | BGFNL | 000098014 | 09/28/2013 | CHEVRON 0175005 | CARENCRO | LA | PV0054 | 556331xxxxx x3889 | PV0054 | 2009 FORD F150 | 167,925.00 | 348 | UNL REG 86/87 OC | 23.78 | $77.50 |
| RJ913 | BGFNL | 000444357 | 10/02/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 168,081.00 | 156 | UNL REG | 10.91 | $34.91 |
| RJ913 | BGFNL | 000323016 | 10/07/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 168,361.00 | 280 | UNL REG | 17.79 | $56.54 |
| RJ913 | BGFNL | 000245914 | 10/08/2013 | CRAWDAD'S | BAYTOWN | TX | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 168,719.00 | 358 | UNL REG | 21.24 | $69.03 |
| RJ913 | BGFNL | 000135444 | 10/10/2013 | | | | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 0.00 | 0 | FUEL | 19.88 | $66.49 |
| RJ913 | BGFNL | 000441514 | 10/15/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 169,357.00 | 638 | UNL REG | 17.55 | $54.72 |
| RJ913 | BGFNL | 000236825 | 10/19/2013 | EXXONMOBIL | LAFAYETTE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 169,710.00 | 353 | UNL REG | 22.39 | $69.40 |
| RJ913 | BGFNL | 000194240 | 10/24/2013 | TEXACO | LAFAYETTE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 170,065.00 | 355 | UNL REG | 21.39 | $65.63 |
| RJ913 | BGFNL | 000457370 | 10/30/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 170,310.00 | 245 | UNL REG | 17.53 | $53.62 |
| RJ913 | BGFNL | 000314615 | 11/02/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 170,665.00 | 355 | UNL REG | 22.34 | $67.00 |
| RJ913 | BGFNL | 000460187 | 11/06/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 170,990.00 | 325 | UNL REG | 20.57 | $61.68 |
| RJ913 | BGFNL | 000259161 | 11/09/2013 | EXXONMOBIL | LAFAYETTE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 171,300.00 | 310 | UNL REG | 19.94 | $57.80 |
| RJ913 | BGFNL | 000462060 | 11/12/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 171,612.00 | 312 | UNL REG | 20.27 | $60.79 |
| RJ913 | BGFNL | 000240701 | 11/16/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 171,898.00 | 286 | UNL REG | 17.04 | $51.10 |
| RJ913 | BGFNL | 000530270 | 11/21/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 172,230.00 | 332 | UNL REG | 21.90 | $66.98 |
| RJ913 | BGFNL | 000178439 | 11/25/2013 | RACETRAC | LAFAYETTE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 172,542.00 | 312 | UNL REG | 19.87 | $60.79 |
| RJ913 | BGFNL | 000165055 | 11/29/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 172,820.00 | 278 | UNL REG | 18.25 | $57.66 |
| RJ913 | BGFNL | 000491975 | 12/05/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 173,106.00 | 286 | UNL REG | 18.07 | $56.71 |
| RJ913 | BGFNL | 000326567 | 12/09/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 173,384.00 | 278 | UNL REG | 20.01 | $62.40 |
| RJ913 | BGFNL | 000094055 | 12/11/2013 | TEXACO | NATCHITOCHES | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 173,769.00 | 385 | UNL REG | 23.41 | $73.73 |
| RJ913 | BGFNL | 000443479 | 12/13/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 174,095.00 | 326 | UNL REG | 19.96 | $61.85 |
| RJ913 | BGFNL | 000344762 | 12/16/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 174,342.00 | 247 | UNL REG | 20.78 | $63.99 |
| RJ913 | BGFNL | 000211097 | 12/18/2013 | BAYTOWN | BAYTOWN | TX | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 174,632.00 | 290 | UNL REG | 18.45 | $54.62 |
| RJ913 | BGFNL | 000427140 | 12/20/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 174,970.00 | 338 | UNL REG | 20.46 | $63.01 |
| RJ913 | BGFNL | 000290082 | 12/23/2013 | MURPHY6755 | OPELOUSAS | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 175,242.00 | 272 | UNL REG | 18.59 | $55.21 |
| RJ913 | BGFNL | 000291059 | 12/23/2013 | MURPHY7255 | LINDALE | TX | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 175,525.00 | 283 | UNL REG | 18.17 | $54.14 |
| RJ913 | BGFNL | 000077467 | 12/25/2013 | PAPA'S | MAYSVILLE | OK | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 175,793.00 | 268 | UNL REG | 16.53 | $47.94 |
| RJ913 | BGFNL | 000173913 | 12/27/2013 | PAPA'S | MAYSVILLE | OK | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 175,965.00 | 0 | UNL REG | 10.47 | $32.47 |
| RJ913 | BGFNL | 000157833 | 12/28/2013 | SHELL OIL | KILGORE | TX | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 176,253.00 | 460 | UNL REG | 17.12 | $54.09 |
| RJ913 | BGFNL | 000285325 | 12/30/2013 | EXXONMOBIL | RAYNE | LA | PV0054 | 556331xxxxx | PV0054 | 2009 FORD | 176,579.00 | 326 | UNL REG | 18.95 | $59.29 |

SP 000100

## DECLARATION OF BRANDY MULHERIN

STATE OF TEXAS

CITY OF PORT OF ARTHUR

Pursuant to 28 U.S.C. § 1746, the undersigned, Brandy Mulherin, declares under penalty of perjury that the following statements, facts and/or other matters set forth herein are true and correct:

1.      I am an individual of the age of majority, competent to testify as to the matters set forth herein on the basis of my personal knowledge.

2.      I am submitting this declaration in connection with Michael Johnson's Complaint filed against Setpoint Integrated Solutions ("Setpoint") in the United States District Court for the Western District of Louisiana, Lafayette-Opelousas Division, Civil Action No. 6:16-cv-01002.

3.      I am the Director of Human Resources for Setpoint and have held that position since January 2012.

4.      As Direct of Human Resources, I am responsible for staffing, benefits, compliance, employee performance and discipline, salary administration, employee relations, talent development, payroll, and the administration of all HR-related areas.

5.      I am familiar with the requirements and job descriptions for all positions at Setpoint, including that of Product Manager.

6.      Setpoint is an industrial services company that provides process automation, valve, instrumentation, and actuation solutions, as well as comprehensive technical and soft skills training to its clients. Setpoint currently employs approximately 500 employees throughout 14 locations in Texas, Louisiana, Alabama, and Mississippi.

1952858.2



EXHIBIT
5

7.     Michael Johnson has been an employee of Setpoint (at times through various subsidiaries) since 2000.  Since March 2013, he held the position of Product Manager.

8.     A Product Manager's role is to grow the sales of their respective products. A Product Manager's responsibilities include but are not limited to, being a technical resource for the product, making customer visits, performing product demonstrations, conducting and attending lunch and learns, and giving tours of the various Setpoint factories in several different states. Product Managers spend approximately 50 to 60% of their work time traveling by car (including overnight travel).  They are ultimately responsible for the growth of their products in multiple states and are measured by the performance of their products versus the goals set by the manufacturers.

9.     Driving is an essential function of the Product Manager position because Product Managers have to drive between Setpoint locations in Texas, Louisiana, Alabama, and Mississippi and also visit customers in various states and locations.  Many customers are in remote locations.

10.    Because driving is such an integral part of the Product Manager position, Setpoint provides its Product Managers with an auto allowance and a fuel card.

11.    Driving is required of all of Setpoint's Product Managers and to date, every Product Manager employed by Setpoint is able to drive.

12.    Because Michael Johnson was not medically cleared to drive in January 2014, he requested that his brother-in-law be his driver until his doctor allowed him to drive. Setpoint denied this request because Johnson's brother-in-law was not a Setpoint employee and had not been vetted by Setpoint. In February 2014, Johnson took a leave of absence and has not returned to work for Setpoint.

13.     Setpoint never considered Johnson to be disabled. Instead, Setpoint believed that because driving is an essential function of the Product Manager position, Johnson would not be able to perform his tasks as a Product Manager.

14.     There was no vacant position that Johnson was qualified for that could have been offered to him while he had a driving restriction.

15.     Driving is such an essential function of the Position of the Product Manager that the elimination of the driving requirement from his position would have effectively created a new position.

16.     The DMC-Carter Chambers Invoice Transaction Report, attached to Setpoint's Motion for Summary Judgment as Exhibit 3, reflects the transactions on Michael Johnson's company issued fuel card from June 2012 to June 2013.

17.     The DMC – Carter Chambers Fuel Transaction Report from July 24, 2013 to December 30, 2013, attached to Setpoint's Motion for Summary Judgment as Exhibit 4, reflects the transactions on Michael Johnson's company issued fuel card from July 24, 2013 to December 30, 2013.

Executed on the 18th day of August, 2017.

BRANDY MULHERIN

3



# EMPLOYEE HANDBOOK



EXHIBIT

6

## ABOUT THIS HANDBOOK

We prepared this handbook to assist you in finding the answers to many questions that you may have regarding your employment with DMC Carter Chambers, Inc.  Please take the necessary time to read it.

We do not expect this handbook to answer all of your questions.  Your Supervisor and the Human Resource Office are also good sources of information.

Neither this handbook nor any other verbal or written communication by a management representative, is, nor should it be considered to be, an agreement, contract of employment, express or implied, or a promise of treatment in any particular manner in any given situation. DMC Carter Chambers adheres to the policy of employment at will, which permits the Company or the employee to terminate the employment relationship at any time, for any reason, with or without cause or notice. No one other than the President & CEO is authorized to provide any employee with an employment contract or special arrangement concerning terms or conditions of employment.

Many matters covered by this handbook, such as benefit plan descriptions, are also described in separate Company documents. These Company documents always supersede over any statement made in this handbook or by any member of management.

This handbook states only general Company guidelines. The Company may, at any time, in its sole discretion, modify or vary from anything stated in this handbook, with or without notice, except for the rights of the parties to terminate employment at will.

This handbook supersedes all prior handbooks.

SP 000102

# Table of Contents

**Letter from the CEO / President** ..................................................................5

**About DMC Carter Chambers, Inc.** ...........................................................6

**Section 1 - Governing Principles of Employment**

- 1-1. Equal Employment Opportunity .......................................................7
- 1-2. Non-Harassment .............................................................................7
- 1-3. Sexual Harassment .........................................................................7
- 1-4. Drug and Alcohol-Free Workplace ..................................................8
- 1-5. Workplace Violence .........................................................................8
  - o   Prohibited Conduct
  - o   Procedures for Reporting a Threat

**Section 2 - Operational Policies**

- 2-1. Employee Classifications ................................................................9
- 2-2. Salary & Compensation Confidentiality .........................................10
- 2-3. Trial Period ...................................................................................10
- 2-4. Employment Service Credit ...........................................................10
- 2-5. Your Employment Records ............................................................10
- 2-6. Working Hours and Schedule ........................................................10
- 2-7. Timekeeping Procedures ..............................................................11
- 2-8. Overtime ......................................................................................11
- 2-9. Field Pay, Supervisor Field Pay, Offshore Field Pay .....................11
- 2-10. Per Diem ....................................................................................12
- 2-11. Travel Time for Non-Exempt (Hourly) Employees .......................12
- 2-12. Your Paycheck ............................................................................12
- 2-13. Salary Advances .........................................................................12
- 2-14. Performance Review ...................................................................12
- 2-15. Progressive Discipline .................................................................12
- 2-16. Record Retention ........................................................................13

**Section 3 - General Standards of Conduct**

- 3-1. Workplace Conduct .......................................................................13
- 3-2. Punctuality and Attendance ..........................................................14
- 3-3. Use of Communication and Computer Systems .............................14
- 3-4. Camera Phones/Recording Devices ..............................................15
- 3-5. Inspections ...................................................................................16
- 3-6. Smoking ........................................................................................16
- 3-7. Personal Visits and Telephone Calls .............................................16
- 3-8. Solicitation and Distribution ..........................................................16
- 3-9. Personal Workspaces ....................................................................16
- 3-10. Bulletin Boards ...........................................................................17
- 3-11. Confidential Company Information ................................................17
- 3-12. Conflict of Interest and Business Ethics ......................................17

SP 000103

- 3-13. Social Networking / Blogging ...................................................................18
- 3-14. Use of Facilities, Equipment and Property, Including Intellectual Property ...........20
- 3-15. Health and Safety .................................................................................21
- 3-16. Hiring Relatives/Employee Relationships ....................................................21
- 3-17. Employee Dress and Personal Appearance ..................................................22
- 3-18. Publicity & Media / White Papers & Articles ...............................................22
- 3-19. Operation of Vehicles ...........................................................................23
- 3-20. Cell Phone / Text Messaging While Driving .................................................23
- 3-21. Business Expense Reimbursement ............................................................23
- 3-22. Reporting of Arrests / Convictions ...........................................................24
- 3-23. References ........................................................................................24
- 3-24. Exiting the Company .............................................................................24

## Section 4 - Leaves of Absence

- 4-1. Personal Leave ....................................................................................24
- 4-2. Military Leave ......................................................................................25
- 4-3. Family and Medical Leave .......................................................................25

## Section 5 - Benefits

- 5-1. Benefits Overview/ Disclaimer ..................................................................32
- 5-2. Insurance Programs ...............................................................................32
- 5-3. 401(k) Retirement Plan ..........................................................................32
- 5-4. Holidays .............................................................................................32
- 5-5. Paid Time Off ......................................................................................33
- 5-6. Workers' Compensation ..........................................................................33
- 5-7. Jury Duty Leave ...................................................................................33
- 5-8. Bereavement Leave ...............................................................................34
- 5-9. Technician Additional Benefits .................................................................34
- 5-10. Ford X-Plan Vehicle Discount Program ......................................................34
- 5-11. Credit Union .......................................................................................34

**Receipt of Employee Handbook** ........................................................................35

**Receipt of Non-Harassment Policy** ...................................................................36

SP 000104

Receipt of Employee Handbook

This Employee Handbook is an important document intended to help you become acquainted with DMC Carter Chambers. This document is intended to provide guidelines and general descriptions only; it is not the final word in all cases. Individual circumstances may call for individual attention.

Because the Company's operations may change, the contents of this Handbook may be changed at any time, with or without notice, in an individual case or generally, at the sole discretion of management.

Please read the following statements and sign below to indicate your receipt and acknowledgment of this Employee Handbook.

I have received and read a copy of DMC Carter Chambers' Employee Handbook. I understand that the policies, rules and benefits described in it are subject to change at the sole discretion of the Company at any time.

I understand it's my responsibility to review the information within this Handbook and to comply with its contents.

I further understand that my employment is terminable at will, either by myself or the Company, with or without cause or notice, regardless of the length of my employment or the granting of benefits of any kind.

I understand that no contract of employment other than "at will" has been expressed or implied, and that no circumstances arising out of my employment will alter my "at will" status except an express written agreement. I understand that my signature below indicates that I have read and understand the above statements and that I have received a copy of the Company's Employee Handbook.

Employee's Printed Name: _MICHAEL L. JOHNSON_

Signature: _____     Date: _2-2-12_

_To be filed in Employee's Personnel File._

_Page 35 of 36_

SP 000105

# SECTION 1 - GOVERNING PRINCIPLES OF EMPLOYMENT

## 1-1. Equal Employment Opportunity

DMC Carter Chambers is an Equal Opportunity Employer that does not discriminate on the basis of actual or perceived race, creed, color, religion, or national origin, ancestry, citizenship status, age, disability or handicap, sex, marital status, veteran status, sexual orientation, arrest record, or any other characteristic protected by applicable federal, state or local laws. Our management team is dedicated to this policy with respect to recruitment, hiring, placement, promotion, transfer, training, compensation, benefits, employee activities and general treatment during employment.

The Company will endeavor to make a reasonable accommodation to the known physical or mental limitations of qualified employees with disabilities unless the accommodation would impose an undue hardship on the operation of our business. If you need assistance to perform your job duties because of a physical or mental condition, please contact the Director of Human Resources.

Any employees with questions or concerns about equal employment opportunities in the workplace are encouraged to bring these issues to the attention of the Director of Human Resources or their manager as appropriate. The Company will not allow any form of retaliation against individuals who raise issues of equal employment opportunity. To ensure our workplace is free of artificial barriers, violation of this policy will lead to discipline, up to and including termination of employment.

## 1-2. Non-Harassment

It is DMC Carter Chambers' policy to prohibit intentional and unintentional harassment of any individual by another person on the basis of any protected classification including, but not limited to, race, color, national origin, disability, religion, marital status, sexual orientation or age. The purpose of this policy is not to regulate our employees' personal morality, but to ensure that in the workplace, no one harasses another individual.

If you feel that you have been subjected to conduct which violates this policy, you should immediately report the matter to your Supervisor. If you are unable for any reason to contact this person, or if you have not received a satisfactory response within five (5) business days after reporting any incident of what you perceive to be harassment, please contact the Director of Human Resources. Every report of perceived harassment will be fully investigated and corrective action will be taken where appropriate. Violation of this policy will result in disciplinary action, up to and including discharge. All complaints will be kept confidential to the extent possible, but confidentiality cannot be guaranteed. In addition, the Company will not allow any form of retaliation against individuals who report unwelcome conduct to management or who cooperate in the investigations of such reports in accordance with this policy. Employees who make complaints in bad faith may be subject to disciplinary action, up to and including discharge.

## 1-3. Sexual Harassment

It is DMC Carter Chambers' policy to prohibit harassment of any employee by any Supervisor, employee, customer or vendor on the basis of sex or gender. The purpose of this policy is not to regulate personal morality within the Company.  It is, however, to ensure that within the Company all employees are free from sexual harassment. While it is not easy to define precisely what types of conduct could constitute sexual harassment, examples of prohibited behavior include unwelcome sexual advances, requests for sexual favors, obscene gestures, displaying sexually graphic magazines, calendars or posters, sending sexually explicit e-mails and other verbal or

SP 000106

### 3-19. Operation of Vehicles

All employees authorized to drive Company-owned or leased vehicles or personal vehicles in conducting Setpoint Integrated Solutions business must possess a current, valid driver's license and an acceptable driving record. Any change in license status or driving record must be reported to management immediately.  Managers are not to allow any employee to drive on company business that has not been cleared through Human Resources by an MVR review.

All candidates for employment and/or employees who will be driving on company business as a substantial portion of their job (i.e., on auto allowance, has been issued a gas card, drives a company-owned truck or receives mileage on a regular basis) are required to meet the following standards:

- Must have had driver's license for 3 years
- No DWIs for the previous 3 years
- No more than 1 Reckless / Careless driving in the past 3 years
- No more than 2 moving violations in the past 3 years
- No more than 2 tickets for No Seatbelt in the past 3 years

It is the responsibility of every employee to drive safely and obey all traffic, vehicle safety, and parking laws or regulations. Drivers must demonstrate safe driving habits at all times.  Company-owned or leased vehicles may be used only as authorized by management.

### 3-20. Cellular Phone Usage / Text Messaging While Driving

Employees with cell phones must refrain from using their phones while driving. Safety must come before all other concerns. Regardless of the circumstances, including slow or stopped traffic, employees should proceed to a safe location off the road and safely stop the vehicle before placing or accepting a call. If acceptance of a call is absolutely necessary while the employee is driving, the employee must use a hands-free device.  **Text messaging is not permitted while driving.**

Under no circumstances should employees feel that they need to place themselves at risk to fulfill business needs.  Since this policy does not require any employee to use a cell phone while driving, employees who are charged with traffic violations resulting from the use of their phones or text messaging while driving will be solely responsible for all liabilities that result from such actions.

### 3-21. Business Expense Reimbursement

Employees may be reimbursed for reasonable approved expenses incurred in the course of business. These expenses must be approved by your Supervisor, and may include air travel, hotels, motels, meals, cab fare, rental vehicles, or gas and car mileage for personal vehicles. All expenses incurred should be submitted via Oracle along with the receipts in a timely manner.

Employees are expected to exercise restraint and good judgment when incurring expenses. You should contact your Supervisor in advance if you have any question about whether an expense will be reimbursed.

### 3-22. Reporting of Arrests / Convictions

Employees must report any arrest or criminal convictions to their supervisor or the Director of Human

**EXHIBIT**

**7**

*Page 23 of 34*

- 12+ months employment=Eligible for FMLA

You should notify HR or your manager as soon as you know your expected return date.  Please note depending on the reasons for your LOA, you may be asked to provide medical certification of your ability to return to work.

Upon completion of your personal leave of absence, the Company will attempt to return you to your original job, or to a similar position, subject to prevailing business considerations. Reinstatement, however, is absolutely not guaranteed.

Failure to advise management of your availability to return to work, failure to return to work when notified, or your continued absence from work beyond the time approved by the Company will be considered a voluntary resignation of your employment.

Personal Leave of Absence runs concurrently with any Company-provided Short-Term Disability Leave of Absence.

**4-2. Military Leave**

If you are called into active military service or you enlist in the uniformed services, you will be eligible to receive an unpaid military leave of absence. To be eligible for military leave, you must provide management with advance notice of your service obligations unless you are prevented from providing such notice by military necessity or it is otherwise impossible or unreasonable for you to provide such notice.  Provided your absence does not exceed applicable statutory limitations, you will retain reemployment rights and accrue seniority and benefits in accordance with applicable federal and state laws. Please ask management for further information about your eligibility for Military Leave.

If you are required to attend yearly Reserves or National Guard duty, you can apply for an unpaid temporary military leave of absence not to exceed the number of days allowed by law (including travel). You should give management as much advance notice of your need for military leave as possible so that we can maintain proper coverage while you are away.

**4-3. Family and Medical Leave**

**The Leave Policy**

Employees may be entitled to a leave of absence under the Family and Medical Leave Act (FMLA). This policy provides employees information concerning FMLA entitlements and obligations employees may have during such leaves. If employees have any questions concerning FMLA leave, they should contact Human Resources.

**I. Eligibility**

FMLA leave is available to "eligible employees". To be an "eligible employee", an employee must: (1) have been employed by the Company for at least 12 months (which need not be consecutive); (2) have been employed by the Company for at least 1250 hours of service during the 12-month period immediately preceding the commencement of the leave; and (3) be employed at a worksite where 50 or more employees are located within 75 miles of the worksite.


**EXHIBIT**
**8**

*Page 25 of 34*

SP 000108

## II. Entitlements

The FMLA provides eligible employees with a right to leave, health insurance benefits and, with some limited exceptions, job restoration. The FMLA also entitles employees to certain written notices concerning their potential eligibility for and designation of FMLA leave.

### A. Basic FMLA Leave Entitlement:

The FMLA provides eligible employees up to 12 workweeks of unpaid leave for certain family and medical reasons during a 12-month period. The 12-month period is determined based on a rolling 12-month period measured backward from the date an employee uses his/her FMLA leave. Leave may be taken for any one, or for a combination, of the following reasons:

- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son, daughter or parent (but not in-law) who has a **serious health condition**;
- For the employee's own serious health condition (including any period of incapacity due to pregnancy, prenatal medical care or childbirth) that makes the employee unable to perform one or more of the essential functions of the employee's job; and/or
- Because of any **qualifying exigency** arising out of the fact that an employee's spouse, son, daughter or parent is a covered military member on active duty or has been notified of an impending call or order to active duty status in the National Guard or Reserves in support of contingency operation.

A **serious health condition** is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in school or other daily activities. Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Qualifying exigencies** may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

### B. Additional Military Family Leave Entitlement (Injured Service member Leave)

In addition to the basic FMLA leave entitlement discussed above, an eligible employee who is the spouse, son, daughter, parent or next of kin of a **covered service member** is entitled to take up 26 weeks of leave during a single 12-month period to care for the service member with a serious injury or illness. Leave to care for a service member shall only be available during a single-12 month period and, when combined with other FMLA-qualifying leave, may not exceed 26 weeks during the single 12-month period. The single 12-month period begins on the first day an eligible employee takes leave to care for the injured service member.

A **"covered service member"** means a member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment, recuperation, or therapy, is

SP 000109

otherwise in outpatient status, or is on the temporary retired list, for a serious injury or illness. A member of the Armed Forces would have a serious injury or illness if he/she has incurred an injury or illness in the line of duty while on active duty in the Armed Forces provided that the injury or illness may render the service member medically unfit to perform duties of the member's office, grade, rank or rating.

**C. Intermittent Leave and Reduced Leave Schedules**

FMLA leave usually will be taken for a period of consecutive days, weeks or months. However, employees also are entitled to take FMLA leave intermittently or on a reduced leave schedule when medically necessary due to a serious health condition of the employee or covered family member or the serious injury or illness of a covered service member.

**D. No Work While on Leave**

Taking another job while on family/medical leave or any other authorized leave of absence is grounds for immediate termination, to the extent permitted by law.

**E. Protection of Group Health Insurance Benefits**

During FMLA leave, eligible employees are entitled to receive group health plan coverage on the same terms and conditions as if they had continued to work.

**F. Restoration of Employment and Benefits**

At the end of FMLA leave, subject to some exceptions including situations where job restoration of "key employees" will cause the Company substantial and grievous economic injury, employees generally have a right to return to the same or equivalent positions with equivalent pay, benefits and other employment terms. The Company will notify employees if they qualify as "key employees", if it intends to deny reinstatement, and of their rights in such instances. Use of FMLA leave will not result in the loss of any employment benefit that accrued prior to the start of an eligible employee's FMLA leave.

**G. Notice of Eligibility for, and Designation of, FMLA Leave**

Employees requesting FMLA leave are entitled to receive written notice from the Company telling them whether they are eligible for FMLA leave and, if not eligible, the reasons why they are not eligible. When eligible for FMLA leave, employees are entitled to receive written notice of: 1) their rights and responsibilities in connection with such leave; 2) the Company's designation of leave as FMLA-qualifying or non-qualifying, and if not FMLA-qualifying, the reasons why; and 3) the amount of leave, if known, that will be counted against the employee's leave entitlement.

The Company may retroactively designate leave as FMLA leave with appropriate written notice to employees provided the Company's failure to designate leave as FMLA-qualifying at an earlier date did not cause harm or injury to the employee. In all cases where leaves qualify for FMLA protection, the Company and employee can mutually agree that leave be retroactively designated as FMLA leave.

**III. Employee FMLA Leave Obligations**

**A.  Provide Notice of the Need for Leave**

Employees who take FMLA leave must timely notify the Company of their need for FMLA leave. The

*Page 27 of 34*

following describes the content and timing of such employee notices.

**1. Content of Employee Notice**

To trigger FMLA leave protections, employees must inform the FMLA Coordinator of the need for FMLA-qualifying leave and the anticipated timing and duration of the leave, if known. Employees may do this by either requesting FMLA leave specifically, or explaining the reasons for leave so as to allow the Company to determine that the leave is FMLA-qualifying. For example, employees might explain that:

- a medical condition renders them unable to perform the functions of their job;
- they are pregnant or have been hospitalized overnight;
- they or a covered family member are under the continuing care of a health care provider;
- the leave is due to a qualifying exigency cause by a covered military member being on active duty or called to active duty status; or
- If the leave is for a family member, that the condition renders the family member unable to perform daily activities or that the family member is a covered service member with a serious injury or illness.

Calling in "sick," without providing the reasons for the needed leave, will not be considered sufficient notice for FMLA leave under this policy. Employees must respond to the Company's questions to determine if absences are potentially FMLA-qualifying.

If employees fail to explain the reasons for FMLA leave, the leave may be denied. When employees seek leave due to FMLA-qualifying reasons for which the Company has previously provided FMLA-protected leave, they must specifically reference the qualifying reason for the leave or the need for FMLA leave.

**2. Timing of Employee Notice**

Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days' notice is not possible, or the approximate timing of the need for leave is not foreseeable, employees must provide the Company notice of the need for leave as soon as practicable under the facts and circumstances of the particular case. Employees who fail to give 30 days' notice for foreseeable leave without a reasonable excuse for the delay, or otherwise fail to satisfy FMLA notice obligations, may have FMLA leave delayed or denied.

**B.  Cooperate in the Scheduling of Planned Medical Treatment (Including Accepting Transfers to Alternative Positions) and Intermittent Leave or Reduced Leave Schedules**

When planning medical treatment, employees must consult with the Company and make a reasonable effort to schedule treatment so as not to unduly disrupt the Company's operations, subject to the approval of an employee's health care provider. Employees must consult with the Company prior to the scheduling of treatment to work out a treatment schedule that best suits the needs of both the Company and the employees, subject to the approval of an employee's health care provider. If employees providing notice of the need to take FMLA leave on an intermittent basis for planned medical treatment neglect to fulfill this obligation, the Company may require employees to attempt to make such arrangements, subject to the approval of the employee's health care provider.

When employees take intermittent or reduced work schedule leave for foreseeable planned

*Page 28 of 34*

SP 000111

medical treatment for the employee or a family member, including during a period of recovery from a serious health condition or to care for a covered service member, the Company may temporarily transfer employees, during the period that the intermittent or reduced leave schedules are required, to alternative positions with equivalent pay and benefits for which the employees are qualified and which better accommodate recurring periods of leave.

When employees seek intermittent leave or a reduced leave schedule for reasons unrelated to the planning of medical treatment, upon request, employees must advise the Company of the reason why such leave is medically necessary. In such instances, the Company and employee shall attempt to work out a leave schedule that meets the employee's needs without unduly disrupting the Company's operations, subject to the approval of the employee's health care provider.

**C. Submit Medical Certifications Supporting Need for FMLA Leave (Unrelated to Requests for Military Family Leave)**

Depending on the nature of FMLA leave sought, employees may be required to submit medical certifications supporting their need for FMLA-qualifying leave. As described below, there generally are three types of FMLA medical certifications: an **initial certification**, a **recertification**, and a **return to work/fitness for duty certification**.

It is the employee's responsibility to provide the Company with timely, complete and sufficient medical certifications. Whenever the Company requests employees to provide FMLA medical certifications, employees must provide the requested certifications within 15 calendar days after the Company's request, unless it is not practicable to do so despite an employee's diligent, good faith efforts.  The Company shall inform  employees if submitted medical certifications are incomplete or insufficient and provide employees at least seven calendar days to cure deficiencies. The Company will deny FMLA leave to employees who fail to timely cure deficiencies or otherwise fail to timely submit requested medical certifications.

With the employee's permission, the Company (through individuals other than an employee's direct supervisor) may contact the employee's health care provider to authenticate or clarify completed and sufficient medical certifications. If employees choose not to provide the Company with authorization allowing it to clarify or authenticate certifications with health care providers, the Company may deny FMLA leave if certifications are unclear.

Whenever the Company deems it appropriate to do so, it may waive its right to receive timely, complete and/or sufficient FMLA medical certifications.

**1. Initial Medical Certifications**

Employees requesting leave because of their own, or a covered relation's, serious health condition, or to care for a covered service member, must supply medical certification supporting the need for such leave from their health care provider or, if applicable, the health care provider of their covered family  or  service member. If employees provide at least 30 days' notice of medical leave, they should submit the medical certification before leave begins. A new initial medical certification will be required on an annual basis for serious medical conditions lasting beyond a single leave year.

If the Company has reason to doubt initial medical certifications, it may require employees to obtain a second opinion at the Company's expense. If the opinions of the initial and second health care providers differ, the Company may, at its expense, require employees to obtain a third, final and

*Page 29 of 34*

SP 000112

binding certification from a health care provider designated or approved jointly by the Company and the employee.

## 2. Medical Recertification

Depending on the circumstances and duration of FMLA leave, the Company may require employees to provide recertification of medical conditions giving rise to the need for leave. The Company will notify employees if recertification is required and will give employees at least 15 calendar days to provide medical recertification.

## 3. Return to Work/Fitness for Duty Medical Certifications

Unless notified that providing such certifications is not necessary, employees returning to work from FMLA leaves that were taken because of their own serious health conditions that made them unable to perform their jobs must provide the Company medical certification confirming they are able to return to work and the employees' ability to perform the essential functions of the employees' position, with or without reasonable accommodation. The Company may delay and/or deny job restoration until employees provide return to work/fitness for duty certifications.

## D. Submit Certifications Supporting Need for Military Family Leave

Upon request, the first time employees seek leave due to qualifying exigencies arising out of the active duty or call to active duty status of a covered military member, the Company may require employees to provide: 1) a copy of the covered military member's active duty orders or other documentation issued by the military indicating the covered military member is on active duty or call to active duty status and the dates of the covered military member's active duty service; and 2) a certification from the employee setting forth information concerning the nature of the qualifying exigency for which leave is requested. Employees shall provide a copy of new active duty orders or other documentation issued by the military for leaves arising out of qualifying exigencies arising out of a different active duty or call to active duty status of the same or a different covered military member.

When leave is taken to care for a covered service member with a serious injury or illness, the Company may require employees to obtain certifications completed by an authorized health care provider of the covered service member. In addition, and in accordance with the FMLA regulations, the Company may request that the certification submitted by employees set forth additional information provided by the employee and/or the covered service member confirming entitlement to such leave.

## E. Substitute Paid Leave for Unpaid FMLA Leave

Employees must use any accrued paid time while taking unpaid FMLA leave.

The substitution of paid time for unpaid FMLA leave time does not extend the length of FMLA leave and the paid time will run concurrently with an employee's FMLA entitlement.

Leaves of absence taken in connection with a disability leave plan or workers' compensation injury/illness shall run concurrently with any FMLA leave entitlement
Upon written request, the Company will allow employees to use accrued paid time to supplement any paid disability benefits.

*Page 30 of 34*

SP 000113

**F. Pay Employee's Share of Health Insurance Premiums**

During FMLA leave, employees are entitled to continued group health plan coverage under the same conditions as if they had continued to work. Unless the Company notifies employees of other arrangements, whenever employees are receiving pay from the Company during FMLA leave, the Company will deduct the employee portion of the group health plan premium from the employee's paycheck in the same manner as if the employee was actively working.
If FMLA leave is unpaid, employees must pay their portion of the group health premium through a method determined by the Company upon leave.

The Company's obligation to maintain health care coverage ceases if an employee's premium payment is more than 30 days late. If an employee's payment is more than 15 days late, the Company will send a letter notifying the employee that coverage will be dropped on a specified date unless the co-payment is received before that date. If employees do not return to work within 30 calendar days at the end of the leave period (unless employees cannot return to work because of a serious health condition or other circumstances beyond their control), they will be required to reimburse the Company for the cost of the premiums the Company paid for maintaining coverage during their unpaid FMLA leave.

**IV. Exemption for Highly Compensated Employees**

The Company may choose not to return highly compensated employees (highest paid 10% of employees at a worksite or within 75 miles of that worksite) to their former or equivalent positions following a leave if restoration of employment will cause substantial economic injury to the Organization. (This fact-specific determination will be made by the Organization on a case-by-case basis). The Organization will notify you if you qualify as a "highly compensated" employee, if the Organization intends to deny reinstatement, and of your rights in such instances.

**V. Questions and/or Complaints about FMLA Leave**

If you have questions regarding this FMLA policy, please contact HR. The Company is committed to complying with the FMLA and, whenever necessary, shall interpret and apply this policy in a manner consistent with the FMLA.

The FMLA makes it unlawful for employers to: 1) interfere with, restrain, or deny the exercise of any right provided under FMLA; or 2) discharge or discriminate against any person for opposing any practice made unlawful by FMLA or involvement in any proceeding under or relating to FMLA. If employees believe their FMLA rights have been violated, they should contact the Human Resources Office immediately. The Company will investigate any FMLA complaints and take prompt and appropriate remedial action to address and/or remedy any FMLA violation. Employees also may file FMLA complaints with the United States Department of Labor or may bring private lawsuits alleging FMLA violations.

**VI. Coordination of FMLA Leave with Other Leave Policies**

The FMLA does not affect any federal, state or local law prohibiting discrimination, or supersede any State or local law, which provides greater family or medical leave rights. For additional information concerning leave entitlements and obligations that might arise when FMLA leave is either not available or exhausted, please consult the Company's other leave policies in this Handbook or contact Human Resources.

*Page 31 of 34*

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division



OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer
may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to
submit a medical certification issued by the employee's health care provider. Please complete Section I before giving
this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask
the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.
Employers must generally maintain records and documents relating to medical certifications, recertifications, or
medical histories of employees created for FMLA purposes as confidential medical records in separate files/records
from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities
Act applies.

Employer name and contact: _Michael L. Johnson_   _337-344-5494_

Employee's job title: _General Manager_ Regular work schedule: _Mon - Friday_

Employee's essential job functions: _Manages Sales and Products_

_Sales and Marketing_

Check if job description is attached: _____

**SECTION II: For Completion by the EMPLOYEE**
**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical
provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical
certification to support a request for FMLA leave due to your own serious health condition. If requested by your
employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613,
2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA
request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R.
§ 825.305(b).

Your name: _Michael_         _L_         _Johnson_
First                Middle                Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA.
Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or
duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical
knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime,"
"unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the
condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: _Jason Cormier, MD   155 Hospital Dr. Ste 110 Lafayette LA 70503_

Type of practice / Medical specialty: _Neurosurgery_

Telephone: (_337_) _534-8680_       Fax: (_337_) _769-9934_

Page 1                          CONTINUED ON NEXT PAGE                          Form WH-380-E  Revised  January 2009

**EXHIBIT**
**9**

PART A: MEDICAL FACTS
1. Approximate date condition commenced: _____

    Probable duration of condition: _Patient returned to work on 7/11/13._

    **Mark below as applicable:**
    Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
    ___No   ✓Yes.  If so, dates of admission:

    _6/18/13   to   6/26/13._

    Date(s) you treated the patient for condition:

    _Surgery in 6/18/13     office 6/27/13._

    Will the patient need to have treatment visits at least twice per year due to the condition?  ___No  ___Yes.  _N/A_

    Was medication, other than over-the-counter medication, prescribed?  ___No  ✓Yes.

    Was the patient referred to other health care provider(s) for evaluation or treatment (_e.g._, physical therapist)?
    ___No  ✓Yes.  If so, state the nature of such treatments and expected duration of treatment:

    _Laborde Physical Therapy._

2. Is the medical condition pregnancy?  ✓No  ___Yes.  If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question.  If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

    Is the employee unable to perform any of his/her job functions due to the condition:  ✓No  ___Yes.
    _not anymore._

    If so, identify the job functions the employee is unable to perform:

    _____

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

    _Dx— left parieto-occipital mass_
    _Surgery— Left parieto-occipital craniotomy, removal of_
    _intracerebral hematoma._

JOHNSON  000021

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No ✓Yes.

    If so, estimate the beginning and ending dates for the period of incapacity: 10/4/13 to 7/11/13

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No ___Yes.   N/A

    If so, are the treatments or the reduced number of hours of work medically necessary? ___No ___Yes.

    Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

    _____

    Estimate the part-time or reduced work schedule the employee needs, if any:

    _____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No ___Yes.   N/A

    Is it medically necessary for the employee to be absent from work during the flare-ups? ____ No ____Yes. If so, explain:

    _____

    _____

    Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency        : _____ times per _____ week(s) _____ month(s)

      Duration: _____ hours or ___ day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER:

_____

_____

_____

_____

_____

Page 3                         CONTINUED ON NEXT PAGE           Form WH-380-E  Revised  January 2009

JOHNSON  000023

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Signature of Health Care Provider                    Date  8/1/13

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29
C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB
control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this
collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining
the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden
estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the
Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC
20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

JOHNSON  000025

NEUROSCIENCE CENTER OF ACADIANA
DAVID L. WEIR, M.D.
DAMON PATTERSON, M.D.
ADAM N. FOREMAN, M.D.
CARMALITA ANDRUS, R.N., A.P.R.N., F.N.P.-BC
106 HOSPITAL DRIVE, SUITE 100

22320
JOHNSON, MICHAEL L
01/11/57
337/344-5494

DOB
DATE 1/7/14

QUANTITY CHECK-OFF BOXES AND REFILL INDICATOR

℞

Mr. Michael Johnson
is cleared to return
to work
at full duty
except driving

☐ 1-24
☐ 25-49
☐ 50-74
☐ 75-100
☐ 101-150
☐ 151 and over
_____ Units

Refill NR 1 2 3 4 5

Dispense as Written ☐       Adam Foreman
                                              (signature)

"Brand Medically Necessary" must be handwritten by the practitioner for
Medicaid/Medicare patients or product selection will be allowed.

♻

3KNE0330646

**EXHIBIT**
**10**

JOHNSON 000035



January 10, 2014

Dear Mrs. Joyce Johnson,

Attached you will find our companies Short Term Disability claim form along with the FMLA forms.  The short term disability form needs to be filled out if Michael is going to be out more than 14 days. If he is not then you may hold on to this form. Please have Michael's doctor fill out the FMLA document as we need to have this on file due to his medical illness. This form allows him to take up to 12 weeks off from work without losing his position. If we do not get this form back within 15 days we will have to deny his FMLA request. Please feel free to contact me with any questions or concerns at 225-906-9145 or Rlee@setpointis.com.

Thank you,

Rusti Lee

Rusti Lee
Benefits Administrator
Setpoint Integrated Solutions, Inc.
19151 Highland Rd.
Baton Rouge, LA 70809
225-906-9145 – office
Rlee@setpointis.com – email

formerly known as

Michael Johnson
461-2014-01625

54 of 99

**EXHIBIT 11**

JOHNSON 000104

**McGLINCHEY STAFFORD** ——————————————————— ATTORNEYS AT LAW

KYLE A. FERACHI
(713) 335-2111 (Houston)                    CALIFORNIA   FLORIDA   LOUISIANA   MISSISSIPPI   NEW YORK   OHIO   TEXAS
(713) 583-9801 (Fax)

(225) 382-3632 (Baton Rouge)
(225) 612-7026 (Fax)
kferachi@mcglinchey.com

February 14, 2014

Michael Johnson
1203 Tornado Drive
Church Point, LA  70525

        RE:    Work Release

Dear Michael,

      We represent Setpoint Integrated Solutions and we are contacting you following a request received by Brandi Piazza, Director of Human resources, from your wife.  It is our understanding that your treating physician has released you to full time status with the exception of being able to drive.  As you know, driving is an essential function of your job with Setpoint.  We ask that you either obtain a full release with no driving restrictions or have your treating physician complete the FMLA paperwork previously provided by Ms. Piazza.

      If you would like to apply for short term disability, please also complete the paperwork provided by Ms. Piazza.

      . If you have any questions regarding this, please feel free to contact me directly.  I understand from your wife's voicemail that your family has retained an attorney.  Should you attorney wish to discuss any issues related to your employment please ask her to contact me.

      In the interim, should you have any questions or comments regarding this, please contact our office.

      As I remain, with kindest regards,

               Very Truly Yours,

               McGLINCHEY STAFFORD

               KYLE A. FERACHI

KAF/CLM

CC: BRANDY PIAZZA

1001 McKinney, Suite 1500 • Houston,TX 77002-6420 • (713) 520-1900 • Fax (713) 520-1025 • www.mcglinchey.com
McGlinchey Stafford PLLC in Florida, Louisiana, Mississippi, New York, Ohio and Texas,
McGlinchey Stafford LLP in California.

Michael Johnson
461-2014-01625

73 of 99



EXHIBIT
**12**

JOHNSON 000113



# McGLINCHEY STAFFORD

KYLE A. FERACHI
(713) 335-2111 (Houston)
(713) 583-9601 (Fax)

(225) 382-3632 (Baton Rouge)
(225) 612-7026 (Fax)
kferachi@mcglinchey.com

ATTORNEYS AT LAW

CALIFORNIA   FLORIDA   LOUISIANA   MISSISSIPPI   NEW YORK   OHIO   TEXAS

March 11, 2014

*Via email (Jeremy@lawbecker.com) and U.S. mail*

Mr. Jeremy A. Hebert
Becker & Hebert
910 Harding St.
Lafayette, LA 70503-2450

RE:   Michael Johnson

Dear Jeremy:

I have tried unsuccessfully to reach you via phone. As you know, my firm represents Setpoint Integrated Solutions, Inc. ("Setpoint"). I received a voice message from you a couple of weeks ago regarding your client Michael Johnson.

Mr. Johnson's last day of work with Setpoint was February 7, 2014. He advised on or around that time that he was released to work by his doctor, but was not able to drive. As driving is an essential function of his job as a Product Manager, Setpoint's human resources department provided Mr. Johnson with forms for short term disability ("STD") and family medical leave ("FMLA"). Setpoint received several voicemails from Mr. Johnson's wife explaining that Mr. Johnson's doctor would not sign the documents because Mr. Johnson was not "disabled." Setpoint has not asked for a declaration that Mr. Johnson is disabled, but has merely tried to determine if a qualifying event has occurred to entitle Mr. Johnson to protection under the FMLA.

Given Mr. Johnson's refusal to provide the STD or FMLA paperwork and his failure to maintain contact with his supervisor, Bill Kiteley, Setpoint assumes that Mr. Johnson has abandoned his job and it will no longer consider Mr. Johnson an employee. Based on a records review, Mr. Johnson has received all outstanding PTO and accrued wages.

**EXHIBIT**
**13**

Michael Johnson
461-2014-01625

11 of 99

Mr. Jeremy A. Hebert
Becker & Hebert
March 11, 2014
Page 2

Should you have any questions or comments regarding this, please contact our office.

Sincerely,

MCGLINCHEY STAFFORD

KYLE A. FERACHI

| Tom Schedler<br>Secretary of State | State of<br>Louisiana<br>Secretary of<br>State | **COMMERCIAL DIVISION**<br>**225.925.4704** |
|---|---|---|



Fax Numbers
225.932.5317 (Admin. Services)
225.932.5314 (Corporations)
225.932.5318 (UCC)

| **Name** | | **Type** | **City** | **Status** |
|---|---|---|---|---|
| JOHNSON ENERGY PRODUCTS, LLC | | Limited Liability Company | SCOTT | Active |

**Previous Names**

| | |
|---|---|
| **Business:** | JOHNSON ENERGY PRODUCTS, LLC |
| **Charter Number:** | 42621134K |
| **Registration Date:** | 4/19/2017 |

**Domicile Address**

313 TABB RD
SCOTT, LA 70583

**Mailing Address**

PO BOX 60895
LAFAYETTE, LA 70596

## Status

| | |
|---|---|
| **Status:** | **Active** |
| **Annual Report Status:** | **In Good Standing** |
| **File Date:** | 4/19/2017 |
| **Last Report Filed:** | N/A |
| **Type:** | Limited Liability Company |

## Registered Agent(s)

| **Agent:** | JOHN RICHARD |
|---|---|
| **Address 1:** | 313 TABB RD |
| **City, State, Zip:** | SCOTT, LA 70583 |
| **Appointment Date:** | 4/19/2017 |

| **Agent:** | MICHAEL JOHNSON |
|---|---|
| **Address 1:** | 110 TRAVIS ST |
| **City, State, Zip:** | LAFAYETTE, LA 70508 |
| **Appointment Date:** | 5/25/2017 |

| **Agent:** | RICK LEBLANC |
|---|---|
| **Address 1:** | 704 ERASTE LANDRY RD |
| **City, State, Zip:** | LAFAYETTE, LA 70506 |



EXHIBIT
**14**

Commercial - Search

| Appointment Date: | 5/25/2017 |
|---|---|

## Officer(s)

**Additional Officers: No**

| | |
|---|---|
| **Officer:** | JOHN RICHARD |
| **Title:** | Manager |
| **Address 1:** | 313 TABB RD |
| **City, State, Zip:** | SCOTT, LA 70583 |

| | |
|---|---|
| **Officer:** | MICHAEL JOHNSON |
| **Title:** | Member |
| **Address 1:** | 110 TRAVIS ST |
| **City, State, Zip:** | LAFAYETTE, LA 70508 |

| | |
|---|---|
| **Officer:** | RICK LEBLANC |
| **Title:** | Member |
| **Address 1:** | 704 ERASTE LANDRY RD |
| **City, State, Zip:** | LAFAYETTE, LA 70506 |

## Amendments on File (1)

| Description | Date |
|---|---|
| Domestic LLC Agent/Domicile Change | 5/25/2017 |

Print

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 461-2014-01625 |

| Louisiana Commission On Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Michael Johnson | (337) 654-0384 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 1203 Tornado Drive, Church Point, LA 70525 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| SETPOINT INTEGRATED SOLUTIONS, INC. | 500 or More | (225) 906-9145 |

| Street Address | City, State and ZIP Code |
|---|---|
| 19151 Highland Road, Baton Rouge, LA 70809 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 02-07-2014   Latest: 04-11-2014

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)).

I have been employed by this company (through its subsidiaries since 1999) and most recently worked in the position of Product Manager. I was diagnosed with a medical condition in June 2013 and, following surgery, returned to work on July 11, 2013. After suffering two seizures, the company required that I obtain medical clearance. On January 16, 2014, I submitted a doctor's note providing clearance to return to work "at full duty except driving." In an attempt to remedy any potential issues stemming from my driving restrictions (even though driving was not an essential function of my job), I retained a relative and paid him out of my own pocket to serve as my Driver whenever necessary. On February 7, 2014 (without having suffered any further medical issues), the company advised me that I needed to go on a "Leave of Absence" and requested that I complete FMLA and Short-Term Disability forms immediately. I contacted my doctor who did not feel that my condition warranted that I be placed on disability leave. I received a letter dated February 14, 2014 from the company's Attorney stating that I had the following two options: (1) obtain a full release with no driving restrictions or (2) have my doctor complete certain FMLA paperwork (that the company claimed to have provided to me but never did). On March 11, 2014, the company's Attorney sent a letter stating that because I did not provide the requested medical paperwork or maintain contact with my supervisor, Bill Kitely, the company assumed that I

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| [signature] | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date / Charging Party Signature | Jeremy A. Hebert  Bar Roll Number 26327  Notary Public, State of Louisiana  My Commission is for life |

Michael Johnson
461-2014-01625

**EXHIBIT**
**15**

JOHNSON   000054

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 461-2014-01625 |

Louisiana Commission On Human Rights | and EEOC

*State or local Agency, if any*

abandoned my job and I was no longer considered an employee.  Additionally, the company has not properly paid me for quarterly bonuses I was entitled to based on sales generated by and made to my outside contacts.

The company insisted that the driving restriction be lifted despite the fact that I provided an accommodation with no cost to the company to be assisted with driving when it became necessary.  My doctor refused to complete the medical forms because he did not feel that I was disabled.  As for alleged job abandonment, I attempted to contact the company on numerous occasions but the company cut off all communication with me.  Another letter dated April 1, 2014 was sent by the company's Attorney stating that my employment will be shifted to inactive as of March 31, 2014 because I needed to be able to drive in order to complete my tasks as a Product Manager and that public transportation is not realistic and a private driver is not one "vetted" by the company.   The company was clearly attempting to terminate me by any means necessary.

I believe that I have been discriminated against in violation of the Americans With Disabilities Act, as amended.

---

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *IP - 21 - 54*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)<br>Jeremy A. Hebert<br>Bar Roll Number 26327<br>Notary Public, State of Louisiana<br>My Commission is for life |

Michael Johnson
461-2014-01625

JOHNSON  000055